# Exhibit 1

1  Joseph J. Tabacco, Jr., Esq. (SBN 75484)
   (jtabacco@bermandevalerio.com)
2  Christopher T. Heffelfinger, Esq. (SBN 118058)
   (cheffelfinger@bermandevalerio.com)
3  Anthony D. Phillips (SBN 259688)
   (aphillips@bermandevalerio.com)
4  **BERMAN DEVALERIO**
   One California Street, Suite 900
5  San Francisco, California  94111
   Telephone:  415.433.3200
6  Facsimile: 415.433.6382

7  Judd B. Grossman, Esq. (pro hac vice)
   (jgrossman@grossmanllp.com)
8  **GROSSMAN LLP**
   405 Park Avenue – 10th Floor
9  New York, New York  10022
   Telephone: 646.770.7445
10 Facsimile: 646.417.7997

11 *Attorneys for Plaintiff ROBERT HERSKOWITZ and CLASS A*

12 Patrick J. Perotti (pro hac vice)
   (pperotti@dworkenlaw.com)
13 Michael R. Rudick (pro hac vice)
   (mrudick@dworkenlaw.com)
14 **DWORKEN & BERNSTEIN CO., L.P.A.**
   60 South Park Place
15 Painesville, Ohio  44077
   Telephone:  440.352.3391
16 Facsimile:  440.352.3469

17 *Attorneys for Plaintiff PHOEBE JUEL and CLASS B and CLASS C*

18          **UNITED STATES DISTRICT COURT**
          **NORTHERN DISTRICT OF CALIFORNIA**
19                  **San Jose Division**

20 ROBERT HERSKOWITZ, individually and
   on behalf of all others similarly situated,       Lead Case No. 12-CV-02131-LHK
21
                                                      Consolidated with:
22                          Plaintiff,                Case No. 12-CV-03124-LHK
                     v.
23 APPLE INC.,
                           Defendant.                 **PLAINTIFFS' SECOND AMENDED**
24 ─────────────────────────────────                 **CONSOLIDATED CLASS**
                                                      **ACTION COMPLAINT**
25 PHOEBE JUEL, individually and on behalf            **[REDACTED]**
   of all others similarly situated,
26                                                    **CLASS ACTION**
                          Plaintiff,
27                   v.                                **DEMAND FOR JURY TRIAL**
   APPLE INC.,
28

1      Plaintiffs Robert Herskowitz and Phoebe Juel ("Plaintiffs"), individually and on behalf

2   of all others similarly situated, by and through their undersigned attorneys, state as follows

3   upon personal knowledge as to themselves and their own acts, and upon information and belief

4   as to all other matters, which will likely have evidentiary support after a reasonable opportunity

5   for discovery:

6                                    **NATURE OF THE ACTION**

7      1.      Plaintiffs have filed this nationwide putative class action for damages and

8   injunctive relief against Apple based on its unlawful billing practices concerning the sale of

9   digital goods and services ("Product" or "Products"), such as apps, songs, videos, games, and

10  e-books, through the App Store, the iTunes Store, the iBookstore, and the Mac App Store

11  (collectively, the "Apple Stores" or the "e-Stores").

12     2.      Mr. Herskowitz has asserted claims on behalf of Class A, which is defined

13  below to include "All individuals or entities who ordered a single paid (*i.e.*, not free) download

14  of a Product from the App Store, the iTunes Store, the iBookstore, and/or the Mac App Store,

15  received a single paid download of the Product, and (a) were charged by Apple, and paid

16  Apple, more than once for the single paid download of the Product; and/or (b) were charged by

17  Apple, and paid Apple, for a subsequent redownload of the Product that Apple was obligated to

18  provide free of charge."

19     3.      Ms. Juel has asserted claims on behalf of Class B and Class C, which are

20  defined below to include for Class B, "All individuals or entities who purchased any Product

21  from the App Store, the iTunes Store, the iBookstore, and/or the Mac App Store, were charged

22  for and ultimately paid for the Product, did not receive the Product in a usable form, during the

23  purchasing session, and were billed and paid again to receive the same Product in a usable

24  form" and for Class C, "All individuals or entities who paid for any Product from the App

25  Store, the iTunes Store, the iBookstore, and/or the Mac App Store, did not exceed their 5

26  downloads to an Apple-authorized device limit for the Product per the Apple Terms and

27  Conditions, but were billed again for subsequently downloading the same product to an

28  Authorized device."

**PARTIES**

4.      Plaintiff Robert Herskowitz is an individual residing in the State of New York.

5.      Plaintiff Phoebe Juel is an individual residing in the State of Pennsylvania.

6.      Defendant Apple, Inc. is a California corporation with its principal place of business located in Cupertino, California.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction over Apple because:  (1) Apple's principal place of business is in Cupertino, California, which is in the Northern District of California; (2) Apple conducts substantial business in the State of California; and (3) Apple has sufficient minimum contacts with California, or otherwise intentionally avails itself of the markets within California.

8.      This Court has original jurisdiction over all claims in this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the matter in controversy exceeds the sum or value of $5 million, in the aggregate, exclusive of interest and costs, and this is a putative class action involving at least one hundred members in the proposed class and Plaintiffs are not citizens of the same state as Apple.

9.      Venue is proper in this District under 28 U.S.C. § 1391(b) because the acts upon which this action is based occurred in part in this District. Apple received substantial compensation and profits from the sale of its Products and services in this District, and Apple entered into agreements and transactions and/or breached agreements in this District. Thus, Apple's liability arose, in part, in this District.

**FACTUAL ALLEGATIONS**

Apple and the e-Stores

10.      Apple is a multinational corporation that designs and sells consumer electronics, computer software, and personal computers.  Apple is one of the largest publicly traded companies in the world by market capitalization, and the largest technology company in the world by revenue and profit.

11.     Apple's hardware devices include the Mac personal computer, the iPhone, the iPad, and the iPod Touch.  Apple customers can purchase digital goods and services, such as apps, songs, videos, games, and books for use on these and other devices through the e-Stores. Apple offers these devices for sale to customers as allowing the customer to both use and store both Apple and non-Apple products on the device.

12.     Through the iTunes media browser, which Apple describes as "a free app[lication]" that "lets you organize and play digital music and video on your computer," customers can purchase music, videos, and songs, among other things, from the "iTunes Store," a software-based online digital-media store operated by Apple.  Launched on or about April 2003, the iTunes Store has over 26 million songs to purchase, making it the number-one music vendor in the United States.

On July 10, 2008, Apple launched its "App Store," a digital-application distribution platform developed and maintained by Apple that allows users to browse and purchase applications (commonly referred to as "apps").  The App Store offers more than 800,000 apps for iPhones, iPads, and iPod Touch devices.  By December 2012, Apple customers had downloaded over 15 billion apps from the App Store, and the App Store has already generated billions of dollars in revenue for Apple and its developers.

13.     On January 6, 2011, Apple launched the Mac App Store, allowing customers to purchase and download applications for personal Mac computers.  According to Apple, "[t]he Mac App Store is just like the App Store for iPad, iPhone, and iPod touch."  Within twenty-four hours of the Mac App Store's release, Apple announced that customers had downloaded more than 1 million applications from the Mac App Store.

14.     Apple's iBookstore is part of iBooks, Apple's e-book application allowing customers to download and read books on the iPhone, the iPad, and the iPod Touch. From the iBookstore, customers can browse "1.5 million books and counting" by title, author, or genre, and view featured books available on the New York Times bestseller lists.

The Agreement

15.     The "use of the" Apple Stores is governed in every case by Apple's standard "Terms and Conditions":

> THE LEGAL AGREEMENTS SET OUT BELOW GOVERN YOUR USE OF THE ITUNES STORE, MAC APP STORE, APP STORE, AND IBOOKSTORE SERVICES ("SERVICES"). TO AGREE TO THESE TERMS, CLICK "AGREE." IF YOU DO NOT AGREE TO THESE TERMS, DO NOT CLICK "AGREE," AND DO NOT USE THESE SERVICES.[1]

16.     Customers cannot purchase Products through the Apple Stores without agreeing to these Terms and Conditions.  Accordingly, every customer, including Plaintiffs Herskowitz and Juel, entered into the Agreement with Apple prior to using the Apple Stores to purchase Products.

17.     Under the Agreement, as with any consumer transaction, Apple may charge customers only once "for any products purchased and for any additional amounts (including any taxes and late fees, as applicable) that may be accrued by or in connection with your Account."[2]

18.     The Agreement contains a California choice-of-law provision:  "All transactions . . . are governed by California law, without giving effect to its conflict of law provisions. . . .  Risk of loss and title for all electronically delivered transactions pass to the purchaser in California upon electronic transmission to the recipient."[3]

Apple Double Bills Customers For Single Paid Downloads Of The Same Product (Class A)

19.     With troubling regularity, Apple has double-billed customers for purchases of a single paid download of the same Product made through the Apple Stores.  In those cases, when a customer purchases a single download of a song, movie, or book, Apple bills that customer more than once for that Product.

20.     Upon information and belief, one of the most frequent complaints made by e-Stores customers to Apple is that they have been charged more than once for a single paid

---

[1] http://www.apple.com/legal/internet-services/itunes/us/terms.html (last viewed May 15, 2013).
[2] *Id.*
[3] *Id.*

1  download of the same Product. Apple, however, has effectuated a policy and practice of
2  refusing to refund the extra charges to customers whom it has double-billed.

3  21.    According to Apple's internal records, for iTunes alone, there have been over

4  ___ **"duplicate transactions"** since May 1, 2008.  Upon information and belief, similar

5  numbers of Apple customers have been double-billed for a single paid download of the same

6  Product from the other e-Stores.

7  22.    Upon information and belief, in response to the millions of complaints received

8  by Apple concerning instances of double-billing, Apple implemented a policy in June 2011

9  purportedly allowing customers to redownload for free previously purchased Products.

10  23.    Notwithstanding Apple's policy change in June 2011, Apple customers have

11  continued to be double-billed for downloading the same Product.  Indeed, according to Apple's

12  internal records, in September 2012—over one year after Apple allegedly changed its

13  downloading policy—one of Apple's "iOS Applications QA Engineers" identified a glitch in

14  Apple's billing system causing customers to be charged multiple times for downloading the

15  same iTunes song.

16  24.    Apple is aware that the double-billing problems have persisted, but it has

17  continued to refuse to refund millions of Apple customers who have been double-billed.

18  25.    Plaintiff Herskowitz is a victim of Apple's unlawful billing practices.  On or

19  about December 2, 2010, Mr. Herskowitz ordered and received a single download of a "pop"

20  song entitled, "Whataya Want from Me," but he was charged by Apple for a second download

21  of the same Product that he did not order or receive.

22  26.    Because Mr. Herskowitz never ordered or received more than one download of

23  the Product from Apple, Apple double-billed Mr. Herskowitz by charging his credit card $2.58

24  for a single download of a song that should have cost only $1.29.

25  27.    Later that same day, December 2, 2010, Plaintiff Herskowitz reported the

26  double-billing to Apple, generating an automated message stating an iTunes representative is

27  "reviewing your request and will send you a personal response soon."

28

28.     On December 3, 2010, Apple e-mailed Plaintiff Herskowitz denying his request for a refund based on its purported no-refund policy:

> Your request for a refund for "Whataya Want from Me" was carefully considered; however, according to the iTunes Store Terms of Sale, all purchases made on the iTunes Store are ineligible for refund.  This policy matches Apple's refund policies and provides protection for copyrighted materials.

This is the sole explanation that Apple offered to Mr. Herskowitz for denying a refund; Apple never communicated to Mr. Herskowitz, at any point, that it denied a refund because its records showed that Plaintiff purchased the song more than once or received multiple downloads of the same Product.  Apple has sent identical responses to countless other customers who have complained of being charged more than once for a single paid download of the same Product.

29.     Apple's purported "no refund" policy has resulted in a substantial number of Apple Store's 50 million U.S. customers—approximately one quarter of the country's internet users—being double-billed by Apple for a single paid download of the same Product.

Apple Bills Customers For Files Which It Did Not Deliver, and Double Bills Those Customers Who Request Delivery of Products Not Previously Delivered To Them In Useable Form (Class B)

30.     As used by Plaintiff Juel in this pleading, the terms "use" and "usable" mean a Product that can be played, viewed, or utilized in the manner expected by a reasonable buyer of the Product.  The term "download" means transmission from Apple to a customer of a Product, regardless of whether it is usable.  The term "deliver" means a transmission from Apple to a customer of a usable Product during the purchasing session.  The term "successful download" means the same as deliver.

31.     In entering a contract for Purchase of a Product, Apple and its customers intend the customer will receive a usable Product (in the case of a song, one the customer has the ability to play) "once downloaded."

32.     The Agreement, however, does not define the term download.

33.     The ordinary meaning understood by Apple and reasonable customers of the undefined term "download," as used in the Agreement, is the transferring of the Product (file) from Apple to the customer, resulting in the delivery of a Product that can be reasonably, and

promptly, accessed and played (in the case of a song) by the customer. This is in accord with the term "use", which Apple employs in the Agreement.

34. The term "download" as used in the Agreement is not the same as the term "delivery." A customer can click the purchase button in Apple's system to download a Product, but never have a usable Product delivered to them.

35. In addition to the term "download," the Agreement also uses the terms "redownload", "purchase", "deliver", "use", "store", "sync", and "purchasing session", but does not define any of these terms.

36. Apple does not have the right under the Agreement to charge a customer for a file which is not promptly delivered in a usable fully-functional format.

37. Apple recognizes that technical problems with its system frequently prevent the successful delivery of purchased Products to customers, leaving them with incomplete, non-usable Product.

38. Apple likewise recognizes that, because of problems with its system, customers frequently download Products, but are not delivered usable Products.

39. Apple further anticipated litigation over its performance of its obligations under the Agreement, and provided in the Agreement for the customer to bring suit only in a California court: "You expressly agree that exclusive jurisdiction for any claim or dispute with Apple . . . resides in the courts of the State of California."[4]

40. Apple sought to limit the remedy a customer could obtain in a suit, providing in the Agreement that the sole and exclusive remedy is either a refund <u>or</u> replacement of the product not properly delivered:

> If technical problems prevent or unreasonably delay delivery of your product, your exclusive and sole remedy is either replacement or refund of the price paid, as determined by Apple.

---

[4] http://www.apple.com/legal/internet-services/itunes/us/terms.html (last viewed May 15, 2013).

41.     Plaintiff Phoebe Juel brought this lawsuit in California, because Apple breached this provision of the contract by charging her twice for a Product that it only delivered to her once.

42.     On or about December 31, 2010, Ms. Juel contacted Apple and commenced a "purchasing session" to buy various music Products from Apple.

43.     Apple's system requires the customer to identify the song they wish to buy, and then to click a button in order to make the purchase.

44.     The customer has no control over Apple's download or Apple's delivery of the Product to the customer.

45.     When the customer clicks the purchase button, the download begins.

46.     If the download is successful in delivering a usable Product to the customer, the Product will appear on the screen of the device on which the customer purchased the Product, and the customer will be able to use the Product.

47.     However, Apple's system frequently commences and internally reflects "download" of a Purchased Product, but fails to deliver the Product to the customer so that the Product does not appear in the customer's library, and the customer cannot use the Product for which they have paid Apple's purchase price.

48.     Apple is aware of this problem.  Futher, Apple is aware that customers in this situation typically re-click the purchase button to receive delivery of the Product.  Apple is aware that, although this action typically results in a successful download of the Product (i.e., the Product appears in the customer's iTunes library in a fully-functional, playable format), Apple's system issues a duplicate billing for the Product, so the customer receives the Product only once, but is charged twice. Apple's internal records provided in discovery show that Apple is able to identify the number of individuals who have been charged more than once for a single Product in this fashion.

49.     In the case of Ms. Juel, she commenced a purchasing session with Apple on or about December 31, 2010 and during that session wished to purchase the song Auld Lang Syne by the Barenaked Ladies.

50.     Ms. Juel clicked the purchase button, commencing a download at 7:06 p.m., but the song never appeared in her iTunes music library, and she was not able to find or play it.

51.     Apple breached its Agreement with Ms. Juel by charging her for a download at 7:06 p.m., which was not delivered to her, when its Agreement with Ms. Juel provides that it is obligated to refund the purchase price in such instances.

52.     Alternatively, Apple breached its Agreement with Ms. Juel by assessing a second charge for the replacement delivery.

53.     Specifically, when Ms. Juel re-clicked the purchase button at 7:09 p.m. to obtain delivery of the song to her library, the download was successful, resulting in the timely delivery of a fully-functional version of the Product to her personal computer, which promptly appeared in her iTunes music library. The download at 7:09 p.m. was the only one to result in delivery of the song; that is, it was the only one to result in a usable Product.

54.     Apple contends that its records show downloads at both 7:06 p.m. and 7:09 p.m., but Apple's records do not show whether those downloads resulted in a delivery of the Product. Ms. Juel agrees that Apple can properly treat the download at 7:09 p.m. as a replacement of the unsuccessful delivery of the 7:06 p.m. purchase, but Apple breached its Agreement with Ms. Juel by charging her for both: once for the successfully delivered song, and once for the unsuccessful delivery.  Apple has made no effort to refund to Ms. Juel the price that she paid for the unsuccessful delivery at 7:06 p.m.

55.     Ms. Juel has retained an expert who is specially and technically familiar with Apple and its system, and the expert has confirmed that there was a fatal problem with the download at 7:06 p.m.

56.     The following averments in paragraphs 57-72 are supported by the expert reports, attached hereto as Exhibits B and C.

57.     When a customer Purchases a song in Apple's iTunes Store, their computer sends a notice to Apple, which issues code indicating they have paid for a specified song. Apple's computers then establish a connection with the buyer's computer over the internet and send the data for the song to the customer. If this connection is interrupted and/or distorted

1    before the entirety of the data has been sent, the song will not download correctly. Instead, the

2    user will receive an incomplete, and/or corrupted song. These same circumstances pertain to

3    downloads of other files from Apple, as well.

4        58.    MD5 is an algorithm—a series of equations—which identifies computer files.

5    When a file is run through MD5, the algorithm calculates a 32-character hexadecimal code that

6    is unique to that file. If two files have the same MD5, their contents are identical; if they have

7    different MD5s, there is a fundamental difference in their composition.

8        59.    For a file—here a song—to be "read" and played properly, the download must

9    contain the right combination of information.  The MD5 is a numeric representation of this

10   crucial information.

11       60.     For example, Juel downloaded a file (song) from Apple known commonly as

12   Auld Lang Syne by James Taylor.  She received TWO copies of this file.

13       61.    When sending the same file more than one time, if the file downloaded properly,

14   both of the downloaded files would have the exact same MD5. This would show that both files

15   had the same contents, including the information needed to find and play them correctly.

16       62.    In the case of the James Taylor song, both files, downloaded at different times,

17   had the same MD5.

18       63.    In contrast, the two copies of Auld Lang Syne by the Barenaked Ladies from

19   Apple do NOT contain the same MD5.  The "download" of December 31 at approximately

20   7:06 p.m. has a different MD5 than the one from 7:09 p.m. that same date.

21       64.    Although technology currently available in 2013 allows the reading and playing

22   of files with less than complete data, this was not the case in earlier years, such as 2010.

23       65.    That is, the manner in which a file is "read" for use by a device involves

24   analysis of the gross view of the coding, with the system "filling in" sections, rather than

25   reading every item.  Currently, a file which has less than optimal information can still often be

26   read and played without glitch, due to the advancement of technology.  However, the same file

27   often could not be read and played a few years ago because technology did not allow for such

28   capabilities.

66.     The difference in the MD5 hashes of the 7:06 p.m. file and the 7:09 p.m. file is consistent with the complaint by Juel that she did not find the song on her iTunes library.

67.     Also consistent with Juel's complaint are discrepancies that exist in the "xml" log file on her personal computer.

68.     An "xml" log file is created any time a file is downloaded to a computer.

69.     This file allows a user to pinpoint the location of an identified file.

70.     Both of the Auld Lang Syne songs by James Taylor mentioned above have an xml record in Juel's computer.

71.     However, only the 7:09 p.m. version of the Auld Lang Syne songs by the Barenaked Ladies mentioned above has an xml record in Juel's computer.

72.     The version Juel purchased at 7:06 p.m. does not have any xml record in Juel's computer.

73.     Ms. Juel has also retained an expert who can attest to the frequency in which Apple has unjustifiably charged its customers in this fashion. He states as follows, and Juel makes these averments in this Complaint:

74.     "I am Eric Greenspan, and I was the Co-Founder and CEO of Make it Work, Inc., an IT support company that operated out of Santa Barbara, California, from 2001-2012. Utilizing a staff of more than 50 technicians, Make it Work provided on-site computer services to home users, businesses, and mobile workers. The company's services included PC and Mac troubleshooting, upgrades and maintenance, training, small business networking, centralized storage, wireless systems, and home theater integration. Over more than a decade of operation, my team and I personally managed and investigated hundreds of complaints from Mac users, frustrated with Apple's iTunes system and its repercussions."

75.     "I am specially, technically familiar with Apple, its media players, and the Apple iTunes system."

76.     "Prior to 2011, it was an exceedingly common occurrence for the connection by Apple with customers to become interrupted, causing transmission of songs to fail, meaning that customers never received playable downloads. For example, an iTunes customer might

lose internet connection during the downloading process, which would result in the customer being left with an incomplete and/or corrupted file that was not in ordinary, playable form."

77.     Some applications will allow a connection interruption without jeopardizing the proper download of a file. But this was not the case with music downloads from Apple's iTunes system prior to 2011. Instead, loss of connectivity to the iTunes store during the downloading process would render the buyer's purchase incomplete and/or corrupted."

78.     Apple's internal records, produced in discovery, show millions of customers were charged more than one time for "incomplete downloads," as occurred to Ms. Juel. Apple's records are able to identify those customers without ever examining their personal computers, iPods, etc.

Apple Breached its Agreement by Charging Customers for Multiple Redownloads to an Apple Authorized Device of the Same Product Where the Customer Had Not Exceeded the 5 Authorized Downloads Limit Permitted Under the Terms of the Agreement (Class C)

79.     Another key aspect of the Agreement is that Apple customers are entitled to keep and utilize Products they purchase from the Apple Stores for as long as they wish, so long as they do so "for personal, noncommercial" purposes.  Indeed, to ensure that Apple customers have portability of their Products, customers are "authorized to use Products on five Apple-authorized devices at any time,"[5] and "store Product from up to five different Accounts at a time on compatible devices."[6]

80.     Apple has computerized records for each customer, detailing the Products purchased, the number of devices authorized by Apple for use of a Product, the number of Accounts on which the Product is stored, and all amounts charged for each Product.

81.     For example, after an Apple customer purchases a song he or she can store it on an iPod, a home computer, an office computer, an iPhone, and a vacation home computer.  The "portability" of the music is a key aspect of the purchase, as it is necessary to ensure that

---

[5] http://www.apple.com/legal/internet-services/itunes/us/terms.html  (last viewed May 15, 2013).

[6] Id.

Apple's customers are able to enjoy their purchased digital content wherever they go, and on whichever devices they authorize.

82.    In fact, Apple has made repeated and consistent public material representations to the general public about the manner in which Products (songs, in particular) can be put on multiple devices:

> "The iTunes Music Store offers the revolutionary rights to burn an unlimited number of CDs for personal use and to put music on an unlimited number of iPods for on-the-go listening," said Steve Jobs.[7]

> Songs are downloaded in pristine digital quality and can be burned onto an unlimited number of CDs for personal use, played on up to three Macintosh computers, listened to on an unlimited number of iPods, and used in other Mac applications, including iPhoto, iMovie and iDVD.[8]

> The iTunes Music Store offers groundbreaking personal use rights, that allow users to burn songs onto an unlimited number of CDs for personal use, listen to songs on an unlimited number of iPods, play songs on up to three Macintosh® computers, and use songs in other applications on the Mac®, including iPhoto™, iMovie™ and iDVD™.[9]

> Songs can be burned at no extra cost onto an unlimited number of CDs for personal use, played on up to three computers, and listened to on an unlimited number of iPods.[10]

> The iTunes Music Store gives users the ability to play songs on up to five personal computers, burn a song onto CDs an unlimited number of times, burn the same playlist up to seven times and listen to their music on an unlimited number of iPods.[11]

> The iTunes Music Store, available in the US, UK, France and Germany, is the best way for PC and Mac® users to legally discover, purchase and download music online. Incorporating pioneering features, unmatched personal use rights, breakthrough pricing and Apple's legendary ease of use, the iTunes Music Store gives users the ability to play songs on up to five personal computers, burn a song onto CDs an unlimited number of times, burn the same playlist up to seven times and listen to their music on an unlimited number of iPods. With 125 million song downloads to date and a 70% market share of the legal digital music market, the iTunes Music Store is the leading online music destination in the world.[12]

---

[7] http://www.apple.com/pr/library/2003/apr/28musicstore.html (last viewed May 15, 2013).

[8] http://www.apple.com/pr/library/2003/may/14musicstore.html (last viewed May 15, 2013).

[9] http://www.apple.com/pr/library/2003/may/05musicstore.html (last viewed May 15, 2013).

[10] http://www.apple.com/pr/library/2003/sep/08musicstore.html (last viewed May 15, 2013).

[11] http://www.apple.com/pr/library/2004/oct/14itunes.html (last viewed May 15, 2013).

[12] http://www.apple.com/pr/library/2004/sep/01itunesaffiliate.html (last viewed May 15, 2013).

The iTunes Music Store gives users the ability to play songs on up to five personal computers, burn a song onto CDs an unlimited number of times, burn the same playlist up to seven times and listen to their music on an unlimited number of iPods.[13]

The third generation iTunes Music Store features the industry's largest online music catalog of over 700,000 songs from all five major music companies and over 450 independent music labels, as well as groundbreaking new features including: . . . The rights to play songs purchased from the iTunes Music Store, including songs previously purchased, on up to five personal computers, two more than before . . . .[14]

All iTunes Music Stores feature the same groundbreaking personal use rights, giving users the ability to play songs on up to five personal computers, burn a single song onto CDs an unlimited number of times, burn the same playlist up to seven times and listen to their music on an unlimited number of iPods.[15]

With DRM-free music from the EMI catalog, iTunes customers will have the ability to download tracks from their favorite EMI artists without any usage restrictions that limit the types of devices or number of computers that purchased songs can be played on.[16]

With the expansion of iTunes Plus, customers can now download tracks from a variety of labels without limitations on the type of music player or number of computers that purchased songs can be played on.[17]

With the release of iTunes Plus, customers can now download tracks from their favorite EMI artists without limitations on the type of music player or number of computers that purchased songs can be played on.[18]

iTunes 9 also introduces Home Sharing, which lets you easily transfer music, movies and TV shows among up to five authorized computers in your home. Family members can now view up to five iTunes libraries on their home network, see only the portion of these libraries they don't already have, import their favorite content directly to their own libraries, and automatically add new purchases from other computers into their library. . . . [S]yncing music, photos, movies and TV shows is easier than ever with the added ability to sync music by artist and genre and sync photos by Events and Faces.[19]

---

[13] http://www.apple.com/pr/library/2004/jul/21indie.html (last viewed May 15, 2013).

[14] http://www.apple.com/pr/library/2004/may/05itunes.html; repeated at http://www.apple.com/pr/library/2004/apr/28itunes.html (last viewed May 15, 2013).

[15] http://www.apple.com/pr/library/2005/jun/02itms.html ; repeated at http://www.apple.com/pr/library/2005/jun/23itunes.html (last viewed May 15, 2013).

[16] http://www.apple.com/pr/library/2007/04/02itunes.html (last viewed May 15, 2013).

[17] http://www.apple.com/pr/library/2007/10/17itunes.html (last viewed May 15, 2013).

[18] http://www.apple.com/pr/library/2007/05/30itunesplus.html (last viewed May 15, 2013).

[19] http://www.apple.com/pr/library/2009/09/09itunes.html (last viewed May 15, 2013).

With just one click, they can purchase the songs they want and download them directly into their iTunes 4 music library for just 99 cents per song, without any subscription fees.[20]

[T]he pioneering iTunes Music Store and the market-leading iPod™ digital music player, providing music lovers with a seamless experience for buying, managing and listening to their digital music collections anywhere.[21]

iTunes customers can also choose to download their favorite songs from the world's largest music catalog directly onto their iPhone™ 3G over their 3G network just as they do with Wi-Fi today, for the same price as downloading to their computer. And beginning in April, based on what the music labels charge Apple, songs on iTunes will be available at one of three price points: 69 cents, 99 cents and $1.29, with most albums still priced at $9.99."[22]

83.    Despite these material representations, Apple has refused to allow its customers to redownload Products already purchased from the Apple Stores, without being charged for the same Product a second time, even though the customer did not exceed the devices limit. This conduct is especially troubling in light of the fact that Apple's records specifically indicate that the customer had already purchased the Product and has not exceeded the limit.

84.    Apple drafted its Agreement to use the terms "download" and "redownload" differently. It did not define those terms in the Agreement, and did not give any indication it intended to use them interchangeably.

85.    Apple sought to provide in its Agreement a warning against "loss, destruction or damage" of Product and a limit on recovery of such files, stating the customer may only download that Product once and that Apple would not replace it if lost for any reason.  The Agreement, however, does not define the term download.  Further, the Agreement specifically permits redownloads of Product where the customer is doing so for the purpose of using the product, compared to replacing lost, destroyed or damaged product.   "Solely as an accommodation to you, some Products may be redownloaded for use in accordance with the Usage Rules."   The Usage Rules are the ones which specifically provide that "You [the customer] shall be authorized to use a Product on five Apple-authorized devices at any time."[23]

---

[20] http://www.apple.com/pr/library/2003/jun/23itunes.html (last viewed May 15, 2013).

[21] http://www.apple.com/pr/library/2003/10/16iTunes.html  (last viewed May 15, 2013).

[22] http://www.apple.com/pr/library/2009/01/06itunes.html (last viewed May 15, 2013).

[23] http://www.apple.com/legal/internet-services/itunes/us/terms.html (May 15, 2013)

86.     This is consistent with Apple's design of its system for use and storage of a single Product on more than one Apple authorized device at one time.

87.     Specifically, serious problems regularly occurred and were reported when average customers wanted to have a Product they purchased from Apple on a second, third, etc. device but attempted to do so through means OTHER than redownloading.

88.     Plaintiffs have obtained expert affidavits discussing this practice, and aver as follows:

89.     The Apple system will download any songs purchased from the Apple Stores ("Apple-Originated Songs") to an Apple authorized device WITHOUT changing, moving, or deleting the songs on that device that were not purchased from the Apple Stores ("Non Apple-Originated Songs").

90.     A customer with an iTunes music library on their non-Apple PC, containing 400 Non Apple-Originated Songs can put an Apple-Originated Song on that PC, directly by redownloading from Apple, without affecting their existing music library.

91.     By contrast, if the customer attempts to move that same Apple-Originated Song from their non-Apple PC to another authorized device, Apple's system does not merely effectuate the transfer of that single Apple-Originated Song to the other authorized device.

92.     Apple's system ALSO moves ALL songs on that user's non-Apple PC, including Non Apple-Originated Songs, to a location where the customer cannot reasonably expect to locate them, based on their prior, ordinary experiences with Apple.

93.     Apple's movement of the customer's files persistently created the problem that customers could not find and play their files, without costly professional assistance to locate and recover them.

94.     Further, the Apple system, in many applications, actually overwrites and deletes the original Non Apple-Originated Songs from the customer's non-Apple PC.

95.     As a result of these common, systemic problems, customers were not reasonably able to obtain the advertised benefit of portability of their Apple Products, without redownloading items, rather than trying to transfer them from device to device.

1    96.    Apple was specifically aware of these facts.

2    97.    Accordingly, it was commercially unreasonable for Apple to charge customers

3  more than one time for a Product, which the customer sought to "use" on five devices through a

4  redownload of the Product.

5    98.    Upon information and belief, millions of Apple customers have been charged

6  more than once for Products purchased from the Apple Stores.  Upon information and belief,

7  one of the most frequent complaints made by e-Stores' customers to Apple is that they were

8  forced to repurchase the same Product even though they had yet to exceed the authorized

9  devices limit implemented by Apple in its Terms and Conditions.  Upon information and belief,

10  Apple has acknowledged that many Apple customers have been wrongly charged more than

11  once for Products purchased from the Apple Stores, and Apple has attempted to implement

12  corrective measures in response.

13  **CLASS ALLEGATIONS**

14    99.    Plaintiffs Herskowitz and Juel reallege and incorporate herein all previous

15  paragraphs of this Second Amended Consolidated Class Action Complaint.

16    100.   Plaintiffs bring this purported class action under Rule 23 of the Federal Rules of

17  Civil Procedure on behalf of all others similarly situated, based on their own circumstances as

18  representative members of the following proposed classes (collectively, the "Classes")

19  hereinafter listed and defined:

20    Class A:  All individuals or entities who ordered a single paid (*i.e.*, not free)
      download of a Product from the App Store, the iTunes Store, the iBookstore,
21    and/or the Mac App Store, received a single paid download of the Product, and
      (a) were charged by Apple, and paid Apple, more than once for the single paid
22    download of the Product; and/or (b) were charged by Apple, and paid Apple, for a
      subsequent redownload of the Product that Apple was obligated to provide free of
23    charge.

24    Class B:  All individuals or entities who purchased any Product from the App
      Store, the iTunes Store, the iBookstore, and/or the Mac App Store, were charged
25    for and ultimately paid for the Product, did not during their purchasing session
      receive the Product in a usable form, and were billed and paid again to receive the
26    same Product in a usable form.

27    Class C:   All individuals or entities who paid for any Product from the App
      Store, the iTunes Store, the iBookstore, and/or the Mac App Store, did not exceed
28    their 5 allowed downloads to an Apple-authorized device limit for the Product per

the Apple Terms and Conditions, but were billed again for subsequently downloading the same product to an Authorized device.

101.    Specifically excluded from the proposed Classes are the Court and its staff, Apple, any entity in which Apple has a controlling interest, and the officers, directors, affiliates, legal representatives, successors, subsidiaries, and/or assigns of any such entity.

102.    The proposed Classes meet all requirements for class certification.

## <u>NUMEROSITY</u>

103.    The proposed Classes are so numerous that the individual joinder of all members is impracticable, and it is further impracticable to bring all such persons before this Court. While the exact number and the identities of all members of the Classes are unknown at this time and can only be ascertained through investigation and discovery in this action, Apple conducts business nationwide and, on information and belief, there currently are over 50 million Apple Store customers in the United States—approximately one quarter of the country's internet users.

## EXISTENCE AND PREDOMINANCE OF <br> <u>COMMON QUESTIONS OF LAW AND FACT</u>

104.    The Agreement that controls the transactions of all members of the Classes provides identically for each that "[a]ll transactions on the iTunes Service are governed by California law, without giving effect to its conflict of law provisions."[24]   As such, the law which controls claims by every member of Class A is common and identical, so that the injuries and damages to members of Class A present questions of law and fact that are common to each member of Class A, and that are common to the entire Class A as a whole.  Similarly, the law which controls claims by every member of Class B is common and identical, so that the injuries and damages to members of Class B present questions of law and fact that are common to each member of Class B, and that are common to the entire Class B as a whole. And finally, the law which controls claims by every member of Class C is common and identical, so that the injuries and damages to members of Class C present questions of law and fact that are common to each member of Class C, and that are common to the entire Class C as a whole.

---

[24] http://www.apple.com/legal/internet-services/itunes/us/terms.html (last viewed May 15, 2013).

105.   Plaintiffs seek common equitable relief, including declaratory, injunctive, restitutionary, and other equitable monetary relief, and common measures of economic, compensatory, exemplary, and/or statutory damages, as set forth more fully below.   This includes, but is not limited to, full credits for and/or repayment of the improper charges, or any other monies that were improperly required to be expended as a result of Apple's wrongdoing, plus interest thereon.

106.   The common questions of law and fact arising out of the claims of Class A here at issue exist as to all members of Class A and predominate over any potential individual issues.  These common legal and factual questions include, but are not limited to, the following:

a.   Whether Apple breached the Agreement with its Apple Stores customers;

b.   Whether Apple engaged in a common, repeated practice of billing customers twice for a single paid download of the same Product;

c.   Whether Apple improperly imposed certain charges that were not to be imposed upon Class A  as it was either improper to do so or the charges were not authorized by Class A;

d.   Whether Apple's course of conduct was unfair, unreasonable or unconscionable or constitutes acts of unfair competition, or misleading acts or practices;

e.   Whether Apple's course of conduct violates California's CLRA, Cal Civ. Code § 1750 *et seq.*, and/or California's UCL, Cal. Bus. & Prof. Code § 17200 *et seq.*;

f.   Whether Apple owed and breached a duty of good faith and fair dealing to Class A with respect to the Agreement, as determined by California law common to all Class members;

g.   Whether Class A is entitled to injunctive and other equitable relief; and

h.     Whether Class A is entitled to payment of equitable monetary relief, actual, incidental, consequential, exemplary, and/or statutory damages, plus interest thereon.

107.   The common questions of law and fact arising out of the claims of Class B here at issue exist as to all members of Class B and predominate over any potential individual issues.  These common legal and factual questions include, but are not limited to, the following:

a.     Whether Apple breached the Agreement with its Apple Stores customers;

b.     Whether Apple engaged in a common, repeated practice of double-billing customers who redownloaded Products not delivered to them by Apple;

c.     Whether Apple engaged in a common, repeated practice of failing to refund the purchase price to its customers for purchases that were not successfully downloaded, *i.e.*, those which it did not deliver;

d.     Whether Apple engaged in a common, repeated practice of failing to replace purchases that were not delivered without charging a second time for the replacement;

e.     Whether the conduct in b through d breaches the Agreement, and whether such conduct is a breach of the duty of good faith and fair dealing imposed by California law on all contracts;

f.     Whether Apple's course of conduct was unfair, unreasonable, unconscionable or misleading;

g.     Whether Apple owed and breached a duty of good faith and fair dealing to its customers with respect to the Agreement, as determined by California law common to all members of Class B;

h.     Whether Apple committed fraud under California law by representing uniformly to customers that it was downloading a Product to the customer when Apple knew or should have known it did not deliver to

the customer a usable product, and knew or should have known its conduct would induce the customer to re-click in a reasonable effort to receive the Product and that it would use that conduct to double-bill the customer without informing them of that fact;

i.    Whether Apple committed fraud under California law by representing uniformly to customers that it would refund or replace non-delivered Products, when it had no intention to do so and/or had no intention to do so without double-billing the customers for same;

j.    Whether Apple's internal records produced in discovery and which reveal millions of double-billings for the same Product allow a finding of intent to defraud in favor of the members of Class B;

k.    Whether Class B is entitled to refund of the price paid beyond the price of purchase of a single Product where either b through d occurred;

l.    The amount of revenues and profits Apple received and/or the amount of monies or other obligations imposed on or lost by Class B as a result of such wrongdoing;

m.    Whether Class B is entitled to injunctive and other equitable relief; and

n.    Whether Class B is entitled to payment of equitable monetary relief, actual, incidental, consequential, exemplary, and/or statutory damages, plus interest thereon.

108.    The common questions of law and fact arising out of the claims of Class C here at issue exist as to all members of Class C and predominate over any potential individual issues.  These common legal and factual questions include, but are not limited to, the following:

a.    Whether Apple breached the Agreement with its Apple Stores customers;

b.    Whether Apple engaged in a common, repeated practice of charging customers for multiple redownloads to Apple authorized devices where

1   customers had not yet exceeded the 5 allowed downloads permitted

2   under their Agreement with Apple;

3   c.   Whether the conduct in b breaches the Agreement, and whether such

4   conduct is a breach of the duty of good faith and fair dealing imposed by

5   California law on all contracts;

6   d.   Whether Apple's course of conduct was unfair, unreasonable,

7   unconscionable, or misleading;

8   e.   Whether Apple owed and breached a duty of good faith and fair dealing

9   to its customers with respect to the Agreement, as determined by

10   California law common to all members of Class C;

11   f.   Whether Apple committed fraud under California law by representing

12   uniformly to customers the ability to use a purchased Product on 5

13   authorized devices at the same time, without intending to comply with

14   that representation at the time it was made;

15   g.   Whether Apple's internal records produced in discovery and which

16   reveal millions of double-billings for the same Product allow a finding of

17   intent to defraud in favor of the members of Class C;

18   h.   Whether Class C is entitled to refund of the price paid beyond the price

19   of purchase of a single Product where the conduct described in b

20   occurred;

21   i.   The amount of revenues and profits Apple received and/or the amount of

22   monies or other obligations imposed on or lost by Class C as a result of

23   such wrongdoing;

24   j.   Whether Apple owed and breached a duty of good faith and fair dealing

25   to Class C with respect to the Agreement, as determined by California

26   law common to all members of Class C;

27   k.   Whether Apple committed fraud, as determined under California law by

28   its conduct towards Class C;

l.      Whether Class C is entitled to injunctive and other equitable relief; and

m.      Whether Class C is entitled to payment of equitable monetary relief, actual, incidental, consequential, exemplary, and/or statutory damages, plus interest thereon.

**TYPICALITY OF CLAIMS**

109.    Plaintiff Herskowitz's claims are typical of the claims of Class A.   Plaintiff Herskowitz, like the members of Class A, was a victim of the challenged practices in question, as he was unlawfully double-billed by Apple for a single download of a Product, without receiving reimbursement of such excess charges plus interest thereon.

110.    Plaintiff Herskowitz and the members of Class A have similarly had their legal rights infringed upon, sustained injuries, losses, and damages as described herein and/or are facing irreparable harm arising out of Apple's common course of conduct.   The right of Plaintiff and each member of Class A to payment of any actual, incidental, consequential, exemplary, and/or statutory damages or equitable monetary relief resulting therefrom equally arise from and are attributable to Apple's challenged conduct in violation of the laws alleged herein, as these claims arise from the same core set of facts.

111.    Plaintiff Juel's claims are typical of the claims of Class B.  Plaintiff Juel, like the members of Class B, was a victim of the challenged practices in question, as she was charged for and ultimately paid for a Product, and did not timely receive the Product in usable form

112.    Plaintiff Juel and the members of Class B have similarly had their legal rights infringed upon, sustained injuries, losses, and damages as described herein and/or are facing irreparable harm arising out of Apple's common course of conduct.   The right of Plaintiff and each member of Class B to payment of any actual, incidental, consequential, exemplary, and/or statutory damages or equitable monetary relief resulting therefrom equally arise from and are attributable to Apple's challenged conduct in violation of the laws alleged herein, as these claims arise from the same core set of facts.

113.    Plaintiff Juel's claims are typical of the claims of Class B.  Plaintiff Juel, like the members of Class B, was a victim of the challenged practices in question, charged for and

ultimately paid for a Product, did not receive the Product in a usable form during the purchasing session, and was billed and paid again to receive the same Product in a usable form, with no refund from Apple.

114.    Plaintiff Juel and the members of Class B have similarly had their legal rights infringed upon, sustained injuries, losses, and damages as described herein and/or are facing irreparable harm arising out of Apple's common course of conduct.  The right of Plaintiff and each member of Class B to payment of any actual, incidental, consequential, exemplary, and/or statutory damages or equitable monetary relief resulting therefrom equally arise from and are attributable to Apple's challenged conduct in violation of the laws alleged herein, as these claims arise from the same core set of facts.

115.    Plaintiff Juel's claims are typical of the claims of Class C.  Plaintiff Juel, like the members of Class C, was a victim of the challenged practices in question, as she was charged more than once for a Product which she sought to "use" on five Apple-authorized devices through a redownload of the Product, despite the fact that she had not yet exceeded the 5 authorized device download limit imposed by the Agreement.  This conduct did not occur during the purchasing session of December 31, 2010.

116.    Plaintiff Juel and the members of Class C have similarly had their legal rights infringed upon, sustained injuries, losses, and damages as described herein and/or are facing irreparable harm arising out of Apple's common course of conduct.  The right of Plaintiff and each member of Class C to payment of any actual, incidental, consequential, exemplary, and/or statutory damages or equitable monetary relief resulting therefrom equally arise from and are attributable to Apple's challenged conduct in violation of the laws alleged herein, as these claims arise from the same core set of facts.

## **ADEQUATE REPRESENTATION**

117.    Representative Plaintiffs Herskowitz and Juel will fairly and adequately protect the interests of the members of the respective Classes because:  (1) they have no irreconcilable conflicts with or interests materially antagonistic to those of the members of their respective Classes; (2) Plaintiffs' interests are aligned with the interests of their respective Classes; and

(3) Plaintiffs understand the nature of these allegation and their responsibilities as class representatives to represent the interests of those persons who have been the subject of Apple's unlawful billing practices.

118.    Plaintiffs have retained attorneys who are experienced in the prosecution of class actions, including consumer class actions, who have done significant work investigating or identifying potential claims in this litigation, who have extensive knowledge of the applicable law, and who have committed and will continue to commit substantial resources to representing the Classes.

## SUPERIORITY AND MANAGEABILITY OF CLASS LITIGATION

119.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy and possesses substantial benefits because there is no other available method that has greater practical advantages for handling this litigation on a group-wide basis on behalf of all affected persons.

120.    Individual joinder of all members of the Classes is impracticable as members of the Classes are dispersed throughout the country, and no other method of adjudication of all claims asserted herein is more efficient and manageable while at the same time providing all the remedies available to ensure that the full purpose of the relevant laws is effectuated.

121.    Because the damages suffered by each individual member of the Classes are relatively insubstantial, the liability issues detailed herein predominate, and the relief sought is discrete, the expense and burden of individual litigation in order to obtain such relief would make it difficult or impossible for individual members of the Classes to redress the wrongs done to them on an individual case-by-case basis, and the cost to the court system of adjudicating such litigation on an individual basis would be substantial.  Individualized litigation would also present the potential of varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.

122.    Upon information and belief, the names and addresses of some, if not all, members of the Classes appear in a computer database under Apple's control, so notice of the

pendency and any resolution of this action can be provided in a cost-effective manner to the members of the Classes through publication and/or individual mailings or electronic notice.

**COUNT ONE**
**B<small>REACH OF</small> C<small>ONTRACT</small>**
**(B<small>Y</small> M<small>EMBERS OF</small> C<small>LASS</small> A A<small>GAINST</small> D<small>EFENDANT</small> A<small>PPLE</small>)**

123.   Plaintiff Herskowitz repeats and realleges each and every allegation contained above as if set forth fully herein.

124.   Apple's customers cannot make any purchases through the Apple Stores without agreeing to accept and be bound by the Agreement.  Accordingly, every customer, including Plaintiff Herskowitz, entered into the Agreement with Apple prior to using the Apple Stores to purchase Products.

125.   Plaintiff Herskowitz has performed all, or substantially all conditions, covenants, and promises required on his part to be performed in accordance with the terms and conditions of the Agreement, or they have been waived by Apple.

126.   After ordering and receiving a single download of the same Product from Apple, on or about December 2, 2010 Plaintiff Herskowitz requested that Apple refund the amount of $1.29 that Apple had overbilled him by charging his credit card on file.

127.   Apple breached the Agreement by refusing to refund Plaintiff Herskowitz the $1.29 that it had double-billed him.  Apple similarly double-billed the members of Class A for their purchases under the Agreement, and to date Apple has not refunded those overcharges.

128.   As a result of Apple's breach of the Agreement, Plaintiff Herskowitz and the members of Class A have been damaged in an amount to be determined at trial.

**COUNT TWO**
**B<small>REACH OF</small> C<small>ONTRACT</small>**
**(B<small>Y</small> M<small>EMBERS OF</small> C<small>LASS</small> B A<small>GAINST</small> D<small>EFENDANT</small> A<small>PPLE</small>)**

129.   Plaintiff Juel repeats and realleges each and every allegation contained above as if set forth fully herein.

130.   Apple's customers cannot make any purchases through the Apple Stores without agreeing to accept and be bound by the Agreement.  Accordingly, every customer, including

Plaintiff Juel, entered into the Agreement with Apple prior to using the Apple Stores to purchase Products.

131.   Plaintiff Juel has performed all, or substantially all conditions, covenants, and promises required on her part to be performed in accordance with the terms and conditions of the Agreement, or they have been waived by Apple.

132.   On December 31, 2010, Plaintiff Juel purchased a song from Apple on iTunes.

133.   Plaintiff Juel paid Apple for the purchase of the song.

134.   Apple did not deliver the song to Plaintiff Juel during the purchasing session and she could not access the song.  Apple breached the Agreement it had with Plaintiff Juel by charging her for a song, which Apple did not deliver to her during the purchasing session, by failing to refund that charge and by charging her a second time for replacing that Product.

135.   Apple has acted similarly to the members of Class B by charging them for songs not delivered during the purchasing session and/or failing to refund such charges and/or by charging them a second time for replacing that Product.

136.   Additionally, the Agreement is subject to California contract law, including the U.C.C., which applies to determine contract performance and which requires that a delivery of goods must be conforming to the reasonable commercial or consumer expectations of the Buyer.

137.   Providing a file (song) to Juel and the class members that they cannot find, access, and/or use in a timely fashion is not a conforming delivery, and breaches the Agreement.

138.   As a result of Apple's breach of the Agreement, Plaintiff Juel and the members of Class B have been damaged in an amount to be determined at trial.

**COUNT THREE**
**BREACH OF CONTRACT**
**(BY MEMBERS OF CLASS C AGAINST DEFENDANT APPLE)**

139.   Plaintiff Juel repeats and realleges each and every allegation contained above as if set forth fully herein.

140.   Apple's customers cannot make any purchases through the Apple Stores without agreeing to accept and be bound by the Agreement.  Accordingly, every customer, including Plaintiff Juel, entered into the Agreement with Apple prior to using the Apple Stores to purchase Products.

141.   Plaintiff Juel has performed all, or substantially all conditions, covenants, and promises required on her part to be performed in accordance with the terms and conditions of the Agreement, or they have been waived by Apple.

142.   On December 31, 2010, Plaintiff Juel purchased a song from Apple on iTunes.

143.   Plaintiff Juel paid Apple for the purchase of the song.

144.   Plaintiff Juel later tried to access the song but could not.  When Plaintiff Juel redownloaded it for use in accordance with the Agreement, Apple charged her a second time for the same Product, even though Apple's records showed she had already purchased the song and had not exceeded the 5 allowed downloads to Apple-authorized devices limit imposed by the Agreement.

145.   Apple also, during different purchasing sessions breached the Agreement it had with Plaintiff Juel by charging her more than one time for a Product that she sought to "use" on five Apple-authorized devices through a redownload of the Product, despite the fact that she had not yet exceeded the 5 authorized device download limit imposed by the Agreement.

146.   Apple has acted similarly to the members of Class C, charging them for multiple redownloads of the same Product to Apple-authorized devices where the customers had not exceeded the 5 allowed downloads permitted by the Agreement.

147.   As a result of Apple's breach of the Agreement, Plaintiff Juel and the members of Class C have been damaged in an amount to be determined at trial.

### COUNT FOUR
#### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
#### (BY MEMBERS OF CLASS A AGAINST DEFENDANT APPLE)

148.   Plaintiff Herskowitz repeats and realleges each and every allegation contained above as if set forth fully herein.

149.   Apple entered into the Agreement with Plaintiff Herskowitz and the members of Class A.  There exists under California law an implied promise of good faith and fair dealing in conduct relating to and arising from the Agreement.

150.   Plaintiff Herskowitz has performed all, or substantially all conditions, covenants, and promises required on his part to be performed in accordance with the terms and conditions of the Agreement, or they were waived by Apple.

151.   Apple unfairly interfered with the rights of Plaintiff Herskowitz to receive the benefits of the Agreement by double-billing him for ordering and receiving a single download of a Product purchased under the Agreement.   Accordingly, Apple breached the implied covenant of good faith and fair dealing.

152.   As a direct and proximate result of the aforesaid violations, Plaintiff Herskowitz and the members of Class A have suffered economic damages in an amount to be determined at trial.

## COUNT FIVE
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
#### (BY MEMBERS OF CLASS B AND CLASS C AGAINST DEFENDANT APPLE)

153.   Plaintiff Juel repeats and realleges each and every allegation contained above as if set forth fully herein.

154.   Apple entered into the Agreement with Plaintiff Juel and the members of Class B and Class C.

155.   There exists under California law an implied promise of good faith and fair dealing in conduct relating to and arising from the Agreement.

156.   Plaintiff Juel and the members of Class B have performed all, or substantially all conditions, covenants, and promises required on her part to be performed in accordance with the terms and conditions of the Agreement, or they were waived by Apple.

157.   Plaintiff Juel and the members of Class C have performed all, or substantially all conditions, covenants, and promises required on her part to be performed in accordance with the terms and conditions of the Agreement, or they were waived by Apple.

158.    Apple unfairly interfered with the rights of Plaintiff Juel to receive the benefits of the Agreement by not allowing her to access and/or use the Product she had purchased in a timely fashion, without being charged a second time, and this breached the implied covenant of good faith and fair dealing.

159.    As a direct and proximate result of the aforesaid violations, Plaintiff and the members of Class B have suffered economic damages in an amount to be determined at trial.

160.    As a direct and proximate result of the aforesaid violations, Plaintiff and the members of Class C have suffered economic damages in an amount to be determined at trial.

**COUNT SIX**
**VIOLATIONS OF CAL. BUS. & PROF. CODE § 17200, *ET SEQ.***
**(BY MEMBERS OF CLASS A AGAINST DEFENDANT APPLE)**

161.    Plaintiff Herskowitz repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

162.    Plaintiff Herskowitz brings this count on behalf of himself, on behalf of Class A, and in his capacity as private attorney general against Apple for its unlawful and/or unfair business acts and practices under California's UCL, Cal. Bus. & Prof. Code § 17200 *et seq.*, prohibiting unlawful and/or unfair business acts and practices.

163.    These provisions of California law apply to protect Herskowitz and all Class members because, among other reasons, the Agreement includes a choice-of-law provision stating that "All transactions . . . are governed by California law, without giving effect to its conflict of law provisions."[25]

164.    Apple has double-billed customers, including Plaintiff Herskowitz, for ordering and receiving a single paid download of the same Product from the Apple Stores.

165.    Apple has failed to refund overcharges and Apple has refused to accede to Plaintiff Herskowitz's request for a refund.  Upon information and belief, Apple likewise has failed and refused, and in the future will fail and refuse, to accede to other requests for refunds

---

[25] http://www.apple.com/legal/internet-services/itunes/us/terms.html (last viewed May 15, 2013)

by Plaintiff Herskowitz and the members of Class A.  Upon information and belief, Apple will continue to commit those acts, unless the Court orders Apple to cease and desist.

166.    Apple's acts hereinabove alleged are immoral, unethical, oppressive, and/or unscrupulous and caused and will cause injuries to consumers and, therefore, constitute unfair competition within the meaning of the UCL.

167.    Apple's purported "no-refund policy" under the Agreement precluding refunds to customers who have been double-billed is unconscionable within the meaning of Cal. Civ. Code § 1670.5.

168.    Apple's policy and/or practice under the Agreement of refusing to award refunds to customers who have been double-billed constitutes an unlawful business act or practice within the meaning of the UCL because, among other things, it is unconscionable within the meaning of Cal. Civ. Code § 1670.5, and it constitutes a breach of contract and a breach of the implied covenant of good faith and fair dealing.

169.    As a direct and proximate result of the aforesaid violations, Plaintiff Herskowitz and the members of Class A have suffered substantial economic harm in an amount to be determined at trial.  Because the injuries alleged herein occurred without the knowledge or permission of Plaintiff Herskowitz and/or Class A, they could not have avoided such injuries.

170.    As a direct and proximate result of Apple's violation of the UCL, Apple has been unjustly enriched and should be required to make restitution to Plaintiff Herskowitz and Class A or disgorge its ill-gotten gains under Cal. Bus. & Prof. Code § 17203.

171.    Plaintiff Herskowitz, on behalf of himself and Class A, demands judgment against Apple for injunctive relief in the form of restitution, an injunction enjoining Apple from implementing its "no refund" policy concerning double billing, and/or disgorgement of funds paid to Apple as alleged herein.

### COUNT SEVEN
### VIOLATIONS OF CLRA
#### (BY MEMBERS OF CLASS A AGAINST DEFENDANT APPLE)

172.    Plaintiff Herskowitz repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

1    173.    Plaintiff Herskowitz and Class A are consumers within the meaning of Cal. Civ.

2  Code § 1761(d), entitled the CLRA.

3    174.    Apple violated the CLRA's proscriptions against inserting an unconscionable

4  provision in a contract by implementing an unlawful policy and/or practice of refusing to

5  refund Apple's customers who have been double-billed for ordering and receiving a single paid

6  download of the same Product or services through the Apple Stores.  *See* Cal. Civ. Code

7  § 1770(a)(19).

8    175.    The Products, including iTunes songs, which Apple itself refers to in the

9  Agreement as "digital goods," are not software, but rather, are tangible goods.

10    176.    Mr. Herskowitz's purchases through the iTunes library involved Apple's

11  "services," as the Agreement itself makes clear:

12    THIS LEGAL AGREEMENT BETWEEN YOU AND APPLE INC. ("APPLE")
      GOVERNS YOUR USE OF THE *ITUNES STORE SERVICE (THE*
13    *"SERVICE").*
                          *         *         *
14
      *THE ITUNES STORE SERVICE*
15    *Apple is the provider of the Service*, which permits you to purchase or rent digital
      content ('Products') for end user use only under the terms and conditions set forth
16    in this Agreement.

17    177.    Apple has double-billed customers, including Plaintiff Herskowitz, for a single

18  paid download of the same Product from the Apple Stores.

19    178.    Apple has failed to refund overcharges and refused to accede to the Plaintiff

20  Herskowitz's request for a refund.  Upon information and belief, Apple likewise has failed and

21  refused, and in the future will fail and refuse, to accede to other requests for refunds by Plaintiff

22  Herskowitz and the members of Class A.  Upon information and belief, Apple will continue to

23  commit those acts, unless the Court orders Apple to cease and desist.

24    179.    For the foregoing reasons, Plaintiff Herskowitz, on behalf of himself and all

25  those similarly situated, demands judgment against Apple for injunctive relief in the form of

26  restitution and disgorgement of funds paid to Apple and an injunction enjoining Apple from

27  implementing its "no refund" policy concerning double billing.

28

180.   In accordance with Cal. Civ. Code § 1782(a), on May 8, 2012, Plaintiff Herskowitz's counsel served Apple, by certified mail, with notice of Apple's alleged violations of the CLRA (the "CLRA Demand Letter").

181.   Apple has not met the demand set forth in the CLRA Demand Letter, and therefore, Plaintiff Herskowitz seeks the following relief under Cal. Civ. Code § 1780 for Apple's violations of CLRA § 1770(a)(19):

      a.     actual damages under Cal. Civ. Code § 1780(a)(1);

      b.     an injunction enjoining Apple from implementing its "no refund" policy concerning double-billing under Cal. Civ. Code § 1780(a)(2);

      c.     restitution of all double-billings under Cal. Civ. Code § 1780(a)(3);

      d.     punitive damages under Cal. Civ. Code § 1780(a)(4);

      e.     attorneys' fees and costs under Cal. Civ. Code § 1780(e); and

      f.     any other relief the Court deems proper under Cal. Civ. Code § 1780(a)(5).

## COUNT EIGHT
### FRAUD
### (BY MEMBERS OF CLASS B AGAINST DEFENDANT APPLE)

182.   Plaintiff Juel repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

183.   Apple further and materially represented widely to the public that Apple customers would be entitled to "either replacement or refund of the purchase price paid"[26] for a Product, should "technical problems prevent or unreasonably delay delivery . . . ."[27]

184.   Apple made these representations widely to the public through print, Internet, and other media, with the intent and expectation that all persons considering a purchase of an Apple Product would understand those representations to be applicable. Apple specifically

---

[26] http://www.apple.com/legal/internet-services/itunes/us/terms.html  (last viewed May 15, 2013)
[27] Id.

1   intended that those representations would cause persons to choose to buy Apple Product over

2   competitor's products for those reasons.

3       185.   Plaintiff Juel and the members of Class B did reasonably rely on those

4   representations in purchasing Apple Products.

5       186.   The representations about the ability of Apple customers to receive either

6   replacement or refund of the price paid from Apple where technical problems prevent delivery

7   during the purchasing session are material to transactions with Apple Stores.

8                   187.   Those representations were false.

9       188.   Apple did not provide Plaintiff Juel with a replacement or refund of the price she

10  paid for the song Auld Lang Syne by the Barenaked Ladies at 7:06 p.m. on December 31, 2010.

11      189.   Further, Apple intended to mislead Juel and the members of Class B when it

12  made those representations, since the representations were false. Indeed, such representations

13  run afoul of Apple's official "no refund" policy.

14      190.   Contrary to its representations, Apple did not provide Plaintiff Juel or the

15  members of Class B with replacement or refund of the price paid for Products already

16  purchased from Apple, but not delivered by the company during the purchasing session

17      191.   Just the opposite, Apple billed customers a second time for Products already

18  purchased from Apple, but which were not delivered by Apple during the purchasing session.

19  This conduct is in direct contravention of promises that Apple makes to its customer in its

20  standard Agreement.

21      192.   At the time it made the foregoing representations, and at the time it entered the

22  Agreement with each customer, Apple did not intend to honor those promises and intended to

23  charge customers multiple times for downloading already purchased Products, which had not

24  been successfully delivered during the purchasing session.

25      193.   Apple knew that Plaintiff Juel had already purchased the song at issue, and that

26  it was not delivered to her during the purchasing session. Apple also knew that it had charged

27  Ms. Juel twice for the song at issue, instead of providing her with a replacement or refund of

28  the price paid, as per its Agreement.

194.    Plaintiff Juel was thus harmed by Apple's fraud, in the amount of paying for the same product twice and incurring costs and fees to protect her rights against Apple's fraud.

195.    Apple has acted similarly to the members of Class B, and has harmed them in like manner.

## COUNT NINE
### FRAUD
### (BY MEMBERS OF CLASS C AGAINST DEFENDANT APPLE)

196.    Plaintiff Juel repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

197.    Apple materially represented widely to the public seeking Products for personal and non-commercial use, that by buying from Apple, the customer would be entitled to access, transfer, store, and utilize Products purchased from the Apple Stores for as long as they wish.

198.    Apple further and materially represented widely to the public that purchasers would have "portability" of their Products bought from Apple, and represented that its customers would be "authorized to use Product on five Apple-authorized devices at any time,"[28] and to "store Product from up to five different Accounts at a time on compatible devices."[29]

199.    Apple made these representations widely to the public through print, broadcast, Internet, and other media, with the intent and expectation that all persons considering a purchase of an Apple Product would understand those features to be applicable.   Apple specifically intended that those representations would cause persons to choose to buy Apple Product over competitor's products for those reasons.

200.    Plaintiff Juel and the members of Class C did reasonably rely on those representations in purchasing Apple Products.

201.    The representations about possession and ability to reasonably access, transfer, store and utilize purchased digital content are material to transactions with Apple Stores.

---

[28] http://www.apple.com/legal/itunes/us/terms.html (last viewed May 15, 2013).

[29] *Id.*

1    202.   Those representations were false.

2    203.   Apple did not allow Plaintiff Juel to reasonably access or play the song that she

3    purchased from iTunes.

4    204.   Further, Apple intended to mislead Juel and the members of Class C when it

5    made those representations, since the representations were false.

6    205.   Contrary to its representations, Apple did not allow Juel or the members of Class

7    C to access, transfer, store and/or utilize Products purchased from the Apple Stores.

8    206.   Just the opposite, Apple billed customers a second time for Products they

9    already purchased, directly contrary to its promises to customers, especially the promises that

10   customers could redownload the Product for use on "up to 5 approved devices."

11   207.   At the time it made the foregoing representations, and at the time it entered the

12   Agreement with each customer, Apple did not intend to honor those promises and intended to

13   charge customers multiple times for downloading already purchased Products.

14   208.   Apple knew that Plaintiff Juel had already purchased the song at issue and had

15   not exceeded her devices limit.

16   209.   Plaintiff Juel was thus harmed by Apple's fraud, in the amount of paying for the

17   same product twice and incurring costs and fees to protect her rights against Apple's fraud.

18   210.   Apple has acted similarly to the members of Class C, and has harmed them in

19   like manner.

20                    **PRAYER FOR RELIEF**

21   **WHEREFORE**, Plaintiffs, individually and on behalf of the Classes, pray for an Order

22   as follows:

23   A.   Finding that this action satisfies the prerequisites for maintenance as a class

24   action under Fed. R. Civ. P. 23, and certifying the Classes as defined herein;

25   B.   Designating Plaintiff Herskowitz as representative of Class A and his counsel as

26   Class A counsel;

27   C.   Designating Plaintiff Juel as representative of Class B and her counsel as

28   Class B counsel;

1        D.       Designating Plaintiff Juel as representative of Class C and her counsel as Class

2  C counsel;

3        E.       Entering judgment in favor of Plaintiffs and the Classes and against Apple;

4        F.       Requiring Apple to pay damages, plus interest, sustained by Plaintiffs and the

5  Classes by reason of the acts and transactions alleged herein;

6        G.      Requiring Apple to refund to members of the Classes the amounts of all double-

7  billings;

8        H.      Requiring Apple to refund to members of the Classes the amounts of all

9  unlawful overcharges;

10       I.        Enjoining Apple from implementing its "no refund" policy concerning double-

11  billing;

12       J.       Imposing punitive damages on Apple;

13       K.      Awarding Plaintiffs their costs, expenses, disbursements, and reasonable

14  attorneys' fees in an amount to be determined at trial; and

15       L.       Awarding Plaintiffs and the Classes such other relief as the Court deems just and

16  proper.

1

## DEMAND FOR TRIAL BY JURY

2          Pursuant to Rule 38 (b) of the Federal Rules of Civil Procedure, Plaintiffs

3   hereby demand trial by jury of all issues that may be so tried.

4   DATED: May 15, 2013                          Respectfully submitted.

5

6   **GROSSMAN LLP**                             **DWORKEN & BERNSTEIN CO., L.P.A.**

7   By: */s/ Judd B. Grossman*                   By: */s/ Patrick J. Perotti*
    Judd B. Grossman, Esq. (*pro hac vice*)      Patrick J. Perotti (*pro hac vice*)
8   jgrossman@grossmanllp.com                    pperotti@dworkenlaw.com
    405 Park Avenue – 10th Floor                 Michael R. Rudick (*pro hac vice*)
9   New York, New York  10022                    mrudick@dworkenlaw.com
    Telephone:  646.770.7445                     60 South Park Place
10  Facsimile:  646.417.7997                     Painesville, Ohio  44077
                                                 Telephone:  440.352.3391
11                                               Facsimile:  440.352.3469
    Christopher T. Heffelfinger, Esq.
12  Joseph J. Tabacco, Jr., Esq.
    jtabacco@bermandevalerio.com                 John A. Kithas (SBN 64284)
13  Anthony D. Phillips                          Chris D. Land (SBN 238261)
    aphillips@bermandevalerio.com                **LAW OFFICES OF JOHN A. KITHAS**
14  **BERMAN DEVALERIO**                         One Embarcadero Center, Suite 1020
    One California St., Suite 900                San Francisco, California  94111
15  San Francisco, California  94111             Telephone:  415.788.8100
    Telephone:  415.433.3200                     Facsimile:  415.788.8001
16  Facsimile:  415.433.6382
                                                 *Attorneys for Plaintiff*
17  Robert J. Axelrod, Esq. (*pro hac vice*)     PHOEBE JUEL and CLASS B and CLASS C
    rjaxelrod@pomlaw.com
18  **POMERANTZ GROSSMAN**
    **HUFFORD**
19  **DAHLSTROM & GROSS LLP**
    600 Third Avenue
20  New York, New York  10016
    Telephone:  212.661.1100
21  Facsimile:  212.661.1373

22  *Attorneys for Plaintiff*
    ROBERT HERSKOWITZ and CLASS A
23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E-FILING ATTESTATION**

I, Anthony D. Phillips am the ECF User whose ID and password are being used to file this document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified below has concurred in this filing.

DATED:   May 15, 2013                            By:   _/s/ Anthony D. Phillips_____
                                                              Anthony D. Phillips, Esq.

# EXHIBIT A

STATE OF NEW YORK     )
                         )   ss.:
COUNTY OF NEW YORK   )

     I, Robert Herskowitz, am a Plaintiff in the within action.  I have read the foregoing Second Amended Consolidated Class Action Complaint and I know the contents thereof. The contents as they pertain to my claims against Defendant Apple, Inc. are true to my own knowledge except as to matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

Dated: May ___, 2013

                                                 _____
                                                     Robert Herskowitz

Subscribed and Sworn to
before me on May ___, 2013

_____
    Notary Public

DAVID JAROSLAWICZ
Notary Public, State of New York
No. 02JA7075140
Qualified in New York County
Commission Expires August 20, 2014

# EXHIBIT B

1.   I am Eric Greenspan, and I was the Co-Founder and CEO of Make it Work, Inc., an IT support company that operated out of Santa Barbara, California, from 2001-2012. Utilizing a staff of more than 50 technicians, Make it Work provided on-site computer services to home users, businesses, and mobile workers. The company's services included PC and Mac troubleshooting, upgrades and maintenance, training, small business networking, centralized storage, wireless systems, and home theater integration. Over more than a decade of operation, my team and I personally managed and investigated hundreds of complaints from Mac users, frustrated with Apple's iTunes system and the repercussions associated with its use.

2.   I am specially, technically familiar with Apple, its media players, and the Apple iTunes system.

3.   Prior to 2011, it was an exceedingly common occurrence for the connection by Apple with customers to become interrupted, causing transmission of songs to fail, and leaving customers with unplayable downloads. For example, an iTunes customer might lose internet connection during the downloading process, which would, in turn, interrupt the transmission of the download, resulting in the customer being left with an incomplete and/or corrupted file that was not in ordinary, playable form.

4.   Some applications will allow a connection interruption without jeopardizing the proper download of a file. But this was not the case with music downloads from Apple's iTunes system prior to 2011. Instead, loss of connectivity to the iTunes store during the downloading process had the effect of rendering the buyer's purchase incomplete and/or corrupted.

5.   Another common occurrence associated with Apple's iTunes system prior to 2011 was the disappearance and/or inaccessibility of content.

6.   For example, when iTunes users had music on their iPod, and connected to their iTunes libraries, Apple would erase their iPods when their device was synced to their iTunes library, causing them to lose any content previously stored on their iPods.

7.   In fact, when customers were attempting to move their iTunes music from one authorized device to another, Apple would transfer all the songs, including non-Apple originated songs, in the customers' libraries into its own iTunes folder, which was different from its original storage location on their computers.

8.   These non-Apple originated songs were moved by Apple to a location on the user's computer that I typically refer to as "deeply nested, six levels deep. Simply put, the songs were placed in a location that customers could not expect to locate them, based on their prior, ordinary experiences with Apple.

9.   It was a frequent experience that when Apple users tried to transfer songs from one device to another, customers would state that non-Apple originated songs would disappear from the

destination device. I know this to be the case, because I have personally dealt with a multitude of iTunes customers complaining of this exact occurrence, and I had to deal with this personally on my own devices on numerous occasions.

10. As a result of this practice, Apple customers were hesitant to download music from sources other than Apple's iTunes system.

11. Apple suggested that all these problems could have been avoided if customers would have simply backed-up their iTunes libraries.

12. But from a technical perspective, the backup process is an extremely difficult proposition for the ordinary consumer to grasp and institute correctly. And Apple knows as much, despite its frequent representations to the contrary.

FURTHER AFFIANT SAYETH NAUGHT.

# EXHIBIT C

1. I am Martin J. Mangan III, Vice President of Product Development at VeDISCOVERY, LLC, an electronic data discovery (EDD) firm located in Cleveland, Ohio.In this role, which I have held for the past three years, I am responsible for the creation and implementation of the VeDISCOVERY platform suite, as well as the creation and management of the company's Information Technology Division, which includes EDD Production, Information Systems and Infrastructure, and Software Development. I am adept in all facets of software development, database design, and data processing and testing.

2. I am specially, technically familiar with Apple, its media players, and the Apple iTunes system.

3. I am specially, technically familiar with portable music devices, and portability of music through storage and playback systems.

4. Apple originally began offering music storage and portability through a family of devices commonly known as iPods. The devices were first offered before Apple had created the iTunes Store approach.

5. The theme of Apple's promotion and sale of these products was music portability and ease of music storage and playback for both iTunes and non-iTunes originated music and other files. The common promise found uniformly across Apple's advertising materials was simplicity in storage and access, keeping music 'a mere click away.'

6. Apple represented that its products and system would allow customers to store and access all music—not only iTunes originated songs and other files.

7. When someone buys a song in Apple's iTunes Store, their computer sends a notice to Apple, which contains code indicating that they have paid for a specified song. Apple's computers then establish a connection with the buyer's computer over the internet and send the data for the song to the buyer. If this connection is interrupted and/or distorted before the entirety of the data has been sent, the song will not download correctly. Instead, the user will receive an incomplete, and/or corrupted song. These same circumstances pertain to downloads of other files from Apple, as well.

8. We have been asked about the transfer of certain music files to Ms. Juel on or around December 31, 2010. Juel states she bought the song, Auld Lang Syne by Barenaked Ladies, from Apple's iTunes Store. She states that she clicked the purchase button to download the file, but that while the downloading process started, a completed media file never appeared in her download library. Similarly, Phoebe states that iTunes gave her no indication whatsoever that she had successfully downloaded Auld Lang Syne by Barenaked Ladies, and she was not able to locate the song anywhere on her computer. Under the impression that an error had prevented the successful download of BarenakedLadies' Auld Lang Syne, Phoebe states that she clicked the button a second time, that the process started, and that one copy of the song Auld Lang Syne by Barenaked Ladies then did appear in her download library.

9. The question posed is whether an analysis of the data on the personal computer Phoebe was using on December 31, 2010 shows any indication that there was a technical issue with the first file sent

to her to support her statement that the file did not appear, in a complete and playable form, on her device.

10.     Indeed, the data does support her statement.

11.     MD5 is an algorithm – a series of equations – which identifies computer files. When a file is run through MD5, the algorithm calculates a 32-character hexadecimal code which is unique to that file. If two files have the same MD5, their contents are identical; if they have different MD5s, there is a fundamental difference in their composition.

12.     For a file—here a song---to be 'read' and played properly, the download must contain the right combination of information. The MD5 is a numeric representation of this crucial information.

13.     For example, Juel downloaded a file (song) known commonly as Auld Lang Syne by James Taylor. She received TWO copies of this file.

14.     When sending the same file more than one time, if the file downloaded properly, both of the downloaded files would havethe exact same MD5. This would show that both files had the same contents, including the information needed to find and play them correctly.

15.     In the case of the James Taylor song, both files, downloaded at different times, had the same MD5.

16.     In contrast, the two copies of Auld Lang Syne by the Barenaked LadiesdoNOT contain the same MD5. The 'download' of December 31 at approximately 7:06 p.m. has a different MD5 than the one from 7:09 p.m. that same date.

17.     Although technology currently available in 2013 allows the reading and playing of files with less than complete data, this was not the case in earlier years such as in 2010.

18.     To explain, the manner in which a file is 'read' for use by a device involves analysis of the gross view of the coding, with the system 'filling in' sections rather than reading every item. Currently, a file which has less than optimal information can still often be read and played without glitch due to the advancement of technology. However, the same file often could not be read and played a few years ago because technology did not allow for such capabilities.

19.     The difference in the MD5 hashes of the 7:06 p.m. file and the 7:09 p.m. file is consistent with the complaint by Juel that she did not find the song on her iTunes library.

20.     Also consistent with Juel's complaint are discrepancies that exist in the "xml" log file on her personal computer.

21.     An "xml" log file is created any time a file is downloaded to a computer.

22.     This file allows a user to pinpoint the location of an identified file.

23. Both of the Auld Lang Syne songs by James Taylor mentioned above have an xml record in Juel's computer.

24. However, only the 7:09 versionof the Auld Lang Syne songs by the Barenaked Ladies mentioned above has an xml record in Juel's computer.

25. The version Juel purchased at 7:06 does not have any xml record in Juel's computer.

FURTHER AFFIANT SAYETH NAUGHT.