1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ROBERT HERSKOWITZ, individually and on behalf of all others similarly situated, | Case Nos.:  12-CV-02131-LHK<br>12-CV-03124-LHK |
| Plaintiff, | |
| v. | ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION |
| APPLE, INC., | |
| Defendant. | |
| PHOEBE JUEL, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| v. | |
| APPLE, INC., | |
| Defendant. | |

In this consolidated litigation, Plaintiffs Robert Herskowitz ("Herskowitz") and Phoebe Juel ("Juel"), individually and on behalf of those similarly situated (collectively, "Plaintiffs"), allege that Defendant Apple, Inc. ("Apple") routinely and unlawfully charges its "e-Store" customers more than once for the same products in violation of the consumer agreements governing those transactions and state law. Second Am. Consol. Compl. ("SAC") ECF No. 77-1. Pending before the Court is Plaintiffs' Motion for Class Certification, in which Plaintiffs move to certify three

classes. ("Mot.") ECF No. 105-4. Apple has filed an Opposition, ("Opp'n") ECF No. 156-4, and Plaintiffs have filed a Reply, ("Reply") ECF No. 169-4. The Court held a hearing on the Motion on July 31, 2014. ECF No. 198. Having considered the submissions of the parties, the oral arguments presented at the hearing, and the record in this case, the Court hereby DENIES Plaintiffs' Motion for Class Certification.

I.      BACKGROUND

        A.      Factual Background

                1.      The e-Stores

        Apple's "iTunes Store" is a software-based online digital-media store from which customers can purchase music and videos, among other things. ("Answer") ECF No. 68 ¶ 12. Apple also operates an "App Store," a digital-application distribution platform that allows users to browse and purchase applications ("apps") for iPhones, iPads, and iPod Touch devices. *Id.* In addition, Apple operates a "Mac App Store," which allows users to purchase and download applications for personal Mac computers. *Id.* ¶ 13. Finally, Apple operates an "iBookstore," which is part of "iBooks," Apple's e-book application. *Id.* ¶ 14. The iBookstore allows users to purchase, download and read e-books on iPhones, iPads, and iPod Touch devices. *Id.* Plaintiffs refer to the iTunes Store, App Store, Mac App Store, and iBookstore collectively as the "e-Stores." SAC ¶ 11.

        Use of the Apple e-Stores is governed by Apple's standard "Terms and Conditions," ("Agreement") ECF No. 106-4. *See* Mot. at 4. Plaintiffs claim, and Apple does not dispute, that customers cannot use the e-Stores without first agreeing to the Agreement. *Id.* at 4; Opp'n at 3. The Agreement contains a California choice-of-law provision. Agreement at 11. The Agreement allows Apple to charge customers "for any products purchased." *Id.* at 1. Until October 2011, the Agreement allowed customers to download purchases only once, *id.* at 10, though once downloaded, purchases could be used on up to five authorized devices, *id.* at 5. Customers were therefore charged again for every download of a previously purchased product.[1] In October 2011 Apple launched iTunes in the Cloud, which permits customers to download for free all previously

_____

[1] Apple claims, and Plaintiffs do not dispute, that this provision did not apply to apps and e-books, which have always been redownloadable for free. *See* Opp'n at 4.

Case Nos.: 12-CV-02131-LHK; 12-CV-03124-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**United States District Court**
For the Northern District of California

purchased products, with limited exceptions. Mot. at 4; Opp'n at 4. The Agreement for all e-Stores provides that "[a]ll sales and rentals of products are final." Agreement at 1. The Agreement also provides, however, that "if technical problems prevent or unreasonably delay delivery of your product, your exclusive and sole remedy is either replacement or refund of the price paid, as determined by Apple." *Id.* at 2.

Because prior to October 2011 customers could be charged again for products that they had previously purchased, Apple had a number of technical mechanisms in place to prevent double-billing errors. Mot. at 5:2-3; *accord* Opp'n at 4-5; 6-7. Most significantly for present purposes, when a customer clicked "buy" to purchase a product, the iTunes system was supposed to check if that customer had previously purchased that same product. Mot. at 5. If the customer had previously purchased the product, a warning "pop-up" was supposed to appear informing the customer that she had already purchased the product. *Id.*; *see also* ("Pop-up Ex.") Reply Ex. U, ECF No. 170-21. Once the pop-up appeared, the customer had to either click "buy" again or "cancel." *See* Pop-up Ex.; Opp'n at 4. Plaintiffs allege that Apple's double-billing prevention mechanisms—including the pop-up—did not always function properly. Mot. at 5. Moreover, Plaintiffs allege that Apple intentionally suspended the pop-up between December 24 and 26, 2008. *Id.* at 7. Apple does not contest this claim, and additionally states that the pop-up was disabled on certain hours on December 25, 2009, and December 25, 2010. Opp'n at 4.[2]

### 2.     Double-Billing for a Single Paid Download of the Same Product

Plaintiffs allege that on October 26, 2010, Herksowitz ordered and received a single download of a song titled "Whataya Want from Me" by Adam Lambert. Mot. at 11. On December 2, 2010, Apple charged Herskowitz's credit card twice for "Whataya Want from Me." *Id.* at 12. That is, Apple charged Herskowitz for $2.58 when a single purchase should have cost $1.29. *Id.* Later on December 2, 2010, Herskowitz reported the double-billing to Apple. *Id.* In response, Apple told Herskowitz that Apple would not refund the second charge, stating: "Your request for a

---

[2] Since October 2011 and the launch of iTunes in the Cloud, the pop-up allows customers to redownload previously purchased songs for free. Opp'n at 4.

Case Nos.: 12-CV-02131-LHK; 12-CV-03124-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1  refund for 'Whataya Want from Me' was carefully considered; however, according to the iTunes

2  Store Terms of Sale, all purchases made on the iTunes Store are ineligible for a refund." *Id.*

3      Apple claims that its records show that on October 26, 2010, Herskowitz ordered "Whataya

4  Want from Me" twice and received two downloads. Decl. of Roozbeh Ghaffari ("Ghaffari Decl.")

5  ECF No. 156-12 ¶ 4. Apple argues that this shows that Herskowitz must have clicked "buy" twice.

6  Opp'n at 10. Herskowitz disputes these claims, alleging that he clicked "buy" only once and

7  received only one download of "Whataya Want from Me."[3] *See* ("Herskowitz Dep.") ECF No.

8  170-6 at 227:21-24 ("So this was only one copy on my computer. I never even thought by any way

9  there could be two copies. Because A, I never saw two copies, and B, I never purchased two

10  copies."). Plaintiffs allege that Apple has double-billed millions of users in this manner, and then

11  refused to refund the overcharges based on Apple's purported "no refund" policy. SAC ¶ 29.

12  Plaintiffs allege that double-billing has continued past October 2011, though the launch of iTunes

13  in the Cloud should have meant that customers can re-download previously purchased products for

14  free. Mot. at 8.

15          **3.    Charging Customers for Products Not Delivered, and Double-Billing to
                    Provide Products in a Usable Form**

16      On December 31, 2010, Juel commenced a purchasing session to buy music on the iTunes

17  Store. *Id.* at 12. During the session, Juel clicked "buy" to purchase a song titled "Auld Lang Syne"

18  by the Barenaked Ladies. SAC ¶¶ 49-50. The song started to download at 7:06 p.m. (Eastern). *Id.*

19  Plaintiffs claim the song never appeared in Juel's iTunes library. *Id.* Consequently, Juel clicked

20  "buy" again at 7:09 p.m. SAC ¶ 53. This led to a second download, which resulted in the song

21  appearing in Juel's iTunes library. *Id.* Juel was charged for both downloads. *Id.* ¶ 54. Apple did not

22  provide Juel with a refund. *Id.* Apple claims, and Plaintiffs do not contest, that Juel did not contact

23  Apple for a refund or replacement before clicking "buy" a second time. Opp'n at 9; ("Juel Dep.")

24

25  [3] Apple claims that forensic examination of Herskowitz's computers provides no affirmative
    evidence of any download on October 26, 2010. Opp'n at 11. Apple alleges that the computers
26  provided for examination did not include the computer that Herskowitz used to purchase "Whataya
    Want from Me" on October 26, 2010. *Id.* Apple contends that the computer used was in fact
27  Herskowitz's wife's computer. *Id.* However, Herskowitz has stipulated that Herskowitz will not
    allege that any other computer was used. ECF No. 148. Herskowitz further claims that
28  Herskowitz's wife's computer was damaged and discarded prior to this litigation. *See* Herskowitz
    Aff., ECF No. 167 at 2.

Case Nos.: 12-CV-02131-LHK; 12-CV-03124-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    ECF No. 157-2 at 164:10-18 ("[Q:] [Y]ou didn't contact Apple and ask for a replacement before

2    you clicked the 'buy' button again, did you? [A:] I didn't know the sale had completed. No. I

3    didn't—I didn't contact Apple before clicking the second time. [Q:] Okay. And instead three

4    minutes later you reclicked the 'purchase' button? [A:] Yes.").

5           Plaintiffs allege that this sequence of events is common, as Apple's system "frequently

6    commences and internally reflects 'download' of a Purchased Product, but fails to deliver the

7    Product to the customer so that the Product does not appear in the customer's library." SAC ¶ 47.

8    Plaintiffs allege that Apple is aware of this issue—including the fact that customers typically re-

9    click "buy"— but that Apple's system nevertheless bills customers twice to receive a single

10   "usable" copy of the product. *Id.* ¶ 48.

     **B.**      **Procedural History**

        **1.**     ***Herskowitz v. Apple* and *Juel v. Apple***

13          Herskowitz filed his initial complaint in federal court on April 27, 2012, ECF No. 1, which

14   Herskowitz then amended on June 15, 2012, ECF No. 12. Juel filed her initial complaint in Santa

15   Clara County Superior Court, which Apple then removed to this Court on June 15, 2012. *See* ECF

16   No. 1-2, Case No. 12-CV-3124. On July 10, 2012, the Court related the *Herskowitz* and *Juel* cases.

17   ECF No. 15. Apple then filed a Motion to Consolidate the Related Actions, which the Court

18   granted on November 2, 2012. ECF No. 42.

19          Plaintiffs filed a First Amended Consolidated Class Complaint ("FAC") on November 21,

20   2012. ECF No. 46. On December 11, 2012, Apple filed a Motion to Dismiss Plaintiffs' FAC. ECF

21   No. 47. The Court granted Apple's Motion to Dismiss on April 15, 2013. ("MTD Order") ECF No.

22   56. The Court found that Herskowitz's claim as pleaded was ambiguous: it was not clear if

23   Herskowitz had purchased and downloaded a song once for which Apple charged him twice, or if

24   Herskowitz had (intentionally or unintentionally) purchased and downloaded a single song twice

25   for which Apple charged him twice. *Id.* at 12. The Court noted that whereas the former allegation

26   might suffice to state a claim, the latter allegation would not. *Id.* The Court also found that in light

27   of the express provisions in the Agreement limiting the number of downloads permitted and

28   providing an exclusive remedy in case of delay or download error, Juel had not pleaded sufficient

5

facts to support a claim for either breach of contract or fraud. *Id.* at 11, 20. As a result, the Court

granted Apple's Motion to Dismiss Plaintiffs' claims with leave to amend. *Id.* at 24. Plaintiffs filed

a Second Amended Consolidated Complaint on May 15, 2013. *See* SAC at 38. Apple did not move

to dismiss Plaintiff's SAC, and the case proceeded to discovery.

### 2.   Motion for Class Certification

Plaintiffs filed the instant Motion for Class Certification on February 21, 2014. ECF No.

105. Apple opposed the Motion on May 21, 2014, ECF No. 156, and Plaintiffs replied on June 19,

2014, ECF No. 169. In the Motion,[4] Plaintiffs seek certification of two damages classes (the

"Fifteen-Minute Class" and the "Unusable Product Class") pursuant to subsection (b)(3) of Federal

Rule of Civil Procedure 23, and one injunctive class (the "Active e-Stores Account Class")

pursuant to Rule 23(b)(2).

Excluded from all three Classes are customers who already received a refund from Apple

for a second purchase. Reply at 9. Similarly excluded are the Court and its staff, Apple, any entity

in which Apple has a controlling interest, and the officers, directors, affiliates, legal

representatives, successors, subsidiaries and assigns of such entities. SAC ¶ 101.

### a.   Fifteen-Minute Class:

The Fifteen-Minute Class is defined as:

> All persons or entities who, from April 27, 2008 up to and including the date of
> judgment, purchased any Product from the App Store, the iTunes Store, the
> iBookstore and/or the Mac App Store and were charged for a second download of
> the same Product within fifteen minutes of the first download.

Mot. at vii. The class representative for the Fifteen-Minute Class is Plaintiff Herskowitz.

The Court notes that, read literally, Herskowitz was not "charged for a second download . . .

within fifteen minutes of the first download" as Herskowitz was charged for both downloads of

---

[4] The classes defined in the instant Motion differ from the classes proposed in Plaintiffs' SAC. *Compare* Mot. at vii, *with* SAC ¶ 100. Plaintiffs' SAC proposed three classes. The first two broadly correspond to the Fifteen-Minute Class and Unusable Product Class defined in the instant Motion. The Court therefore adopts the claims asserted in Plaintiffs' SAC for those Classes. However, the SAC also proposed a class defined as "[a]ll [customers] who paid for any product from [an e-Store], did not exceed their 5 allowed downloads to an Apple-authorized device limit for the Product per the [Agreement], but were billed again for subsequently downloading the same product on an Authorized device" (the "Redownload Class"). SAC ¶ 100. No corresponding class appears in the instant Motion, and Plaintiffs represented at the hearing that they do not seek to certify the Redownload Class.

6

Case Nos.: 12-CV-02131-LHK; 12-CV-03124-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

United States District Court
For the Northern District of California

1  "Whataya Want from Me" on December 2, 2010, thirty-seven days after both downloads on

2  October 26, 2010. The Court therefore understands the Fifteen-Minute Class to comprise of "[a]ll

3  persons or entities who . . . were charged for a second download of the same Product within fifteen

4  minutes of *being charged* for the first download" and evaluates the Class accordingly.

5                              **b.      Unusable Product Class:**

6          The Unusable Product Class is defined as:

7          All persons or entities who, from April 27, 2008 up to and including the date of
           judgment, in a single purchasing session: (1) purchased any Product from the App
8          Store, the iTunes Store, the iBookstore, and/or the Mac App Store, (2) were charged
           for and ultimately paid for the Product, (3) did not receive that Product in a usable
9          form, and (4) were billed and paid again to receive that same Product in a usable
           form.
10
11  Mot. at vii. Plaintiffs define a "usable" product as a "Product that can be played, viewed, or utilized

12  in the manner expected by a reasonable buyer of the Product." SAC ¶ 30. The class representative

13  for the Unusable Product Class is Plaintiff Juel.

14                          **c.      Active e-Stores Account Class:**

15          The Active e-Stores Account Class is defined as:

16          All persons or entities who are members of [the Fifteen-Minute Class] and [the
           Unusable Product Class] and have an active e-Stores Account.

17  Mot. at vii. Although, as phrased, this class definition suggests that a customer must be a member

18  of *both* the Fifteen-Minute and Unusable Product Classes in order to be a member of the Active e-

19  Stores Account Class, Plaintiffs clarified at the hearing that they intend for the Active e-Stores

20  Account Class to include any individual who is a member of *either* the Fifteen-Minute Class or the

21  Unusable Product Class. Both Herskowitz and Juel are class representatives for the Active e-Stores

22  Account Class.

23  **II.     LEGAL STANDARD**

24          Rule 23, which governs class certification, has two sets of distinct requirements that

25  Plaintiffs must meet before the Court may certify a class. Plaintiffs must meet all of the

26  requirements of Rule 23(a) and must satisfy at least one of the prongs of Rule 23(b).

27          Under Rule 23(a), the Court may certify a class only where "(1) the class is so numerous

28  that joinder of all members is impracticable; (2) there are questions of law or fact common to the

7

class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Courts refer to these four requirements, which must be satisfied to maintain a class action, as "numerosity, commonality, typicality and adequacy of representation." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012). Further, courts have implied an additional requirement under Rule 23(a): the class must be ascertainable. *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592-93 (3d Cir. 2012); *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 671-72 (N.D. Cal. 2011).

In addition to meeting the requirements of Rule 23(a), the Court must also find that Plaintiffs have satisfied "through evidentiary proof" one of the three subsections of Rule 23(b). *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). The Court can certify a Rule 23(b)(1) class when Plaintiffs make a showing that there would be a risk of substantial prejudice or inconsistent adjudications if there were separate adjudications. Fed. R. Civ. P. 23(b)(1). The Court can certify a Rule 23(b)(2) class if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Finally, the Court can certify a Rule 23(b)(3) class if the Court finds that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)); *see also Mazza*, 666 F.3d at 588 ("'Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23.'" (quoting *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186, *amended by* 273 F.3d 1266 (9th Cir. 2001))). Nevertheless, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 133 S. Ct. at 1194-95.

8

"Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id*. at 1195. Within the framework of Rule 23, the Court ultimately has broad discretion over whether to certify a class. *Zinser*, 253 F.3d at 1186.

## III.   DISCUSSION

Plaintiffs move to certify the three Classes identified above under Rule 23(b)(2) and (b)(3). Apple opposes class certification on the grounds that: (1) none of the Classes satisfies the commonality, typicality, or adequacy of representation requirements of Rule 23(a); (2) the Classes are overbroad and unascertainable; (3) the Fifteen-Minute and Unusable Product Classes do not satisfy the predominance requirement of Rule 23(b)(3); and (4) the Active e-Stores Account Class is not suitable for certification under Rule 23(b)(2). Opp'n at vi. For the reasons discussed below, the Court finds that the Fifteen-Minute and Unusable Product Classes cannot satisfy the predominance requirement of Rule 23(b)(3). The Court additionally finds that, because Plaintiffs do not allege that Apple engages in a practice that is generally applicable to class members and because Plaintiffs' claims are primarily aimed at receiving damages, the Active e-Stores Account Class may not be certified under Rule 23(b)(2). Accordingly, the Court does not reach Apple's remaining contentions. The Court begins with the predominance requirement of Rule 23(b)(3), then turns to the requirements of Rule 23(b)(2).

### A.   Predominance

#### 1.   Legal Standard

The predominance inquiry of Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Accordingly, the predominance analysis "focuses on the relationship between the common and individual issues in the case." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545 (9th Cir. 2013) (internal quotation marks omitted); *see also In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958 (9th Cir. 2009) ("Whether judicial economy will be served in a particular case turns on close scrutiny of the relationship between the common and individual issues." (internal quotation marks omitted)).

9

1     Undertaking the predominance analysis requires some inquiry into the merits, as the Court

2  must consider "how a trial on the merits would be conducted if a class were certified." *Gene &*

3  *Gene LLC v. BioPay LLC*, 541 F.3d 318, 326 (5th Cir. 2008) (internal quotation marks omitted);

4  *see also Zinser*, 253 F.3d at 1190 (noting that district courts must consider as part of the

5  predominance analysis whether a manageable class adjudication can be conducted). However,

6  though the Court needs to consider the merits to determine whether the action can be litigated on a

7  classwide basis, class certification is not an opportunity for the Court to undertake plenary merits

8  inquiries. "Merits questions may be considered to the extent—but only to the extent—that they are

9  relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."

10  *Amgen*, 133 S. Ct. at 1195; *see also In re Whirlpool Corp. Front-Loading Washer Prods. Liab.*

11  *Litig.*, 722 F.3d 838, 851 (6th Cir. 2013) (noting that merits inquiries at the class certification stage

12  are limited to those necessary to resolving the questions presented by Rule 23).

13     The Court's predominance analysis "entails identifying the substantive issues that will

14  control the outcome, assessing which issues will predominate, and then determining whether the

15  issues are common to the class, a process that ultimately prevents the class from degenerating into

16  a series of individual trials." *Gene & Gene*, 541 F.3d at 326 (internal quotation marks omitted); *see*

17  *also In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir. 2008)

18  ("Under the predominance inquiry, a district court must formulate some prediction as to how

19  specific issues will play out in order to determine whether common or individual issues

20  predominate in a given case." (internal quotation marks omitted)); *Hanlon v. Chrysler Corp.*, 150

21  F.3d 1011, 1022 (9th Cir. 1998) (finding predominance "[w]hen common questions present a

22  significant aspect of the case and they can be resolved for all members of the class in a single

23  adjudication" (internal quotation marks omitted)). To meet the predominance requirement,

24  "common questions must be a significant aspect of the case that can be resolved for all members of

25  the class in a single adjudication." *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir.

26  2014) (internal quotation marks and alterations omitted).

27     Importantly, the predominance inquiry is a pragmatic one, in which the Court does more

28  than just count up common issues and individual issues. 7AA WRIGHT & MILLER, FEDERAL

PRACTICE & PROCEDURE § 1778 (3d ed. 2005) (noting that "the proper standard under Rule 23(b)(3) is a pragmatic one, which is in keeping with the basic objectives of the Rule 23(b)(3) class action"). As the Seventh Circuit recently stated, "predominance requires a qualitative assessment too; it is not bean counting." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013). The Court's inquiry is not whether common questions predominate with respect to individual elements or affirmative defenses; rather, the inquiry is a holistic one, in which the Court considers whether overall, considering the issues to be litigated, common issues will predominate. *Amgen*, 133 S. Ct. at 1196.

### 2. Application

To apply the predominance standard to the Fifteen-Minute and Unusable Product Classes, the Court begins by describing the underlying merits inquiry before turning to the question of how best to conduct such an inquiry. *Id.* at 1191 ("[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'" (alterations omitted)). The Court addresses the proposed Classes in turn.

### a. Fifteen-Minute Class

For the Fifteen-Minute Class, Plaintiffs allege breach of contract, breach of the implied covenant of good faith and fair dealing, and violations of the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*, and the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq*. Mot. at 20, 23, 25. The Court will separately assess the predominance of common or individual questions for each claim. *See Berger*, 741 F.3d at 1068 ("[W]e must analyze each of the plaintiff's claims separately. . . . Each potential class must be analyzed on its own merits, with consideration given to the elements of the claim at stake." (citation omitted)).

### i. Breach of Contract

Plaintiffs contend that Apple breached the Agreement by charging customers for a Product that was not a "purchase" within the meaning of the Agreement. Plaintiffs' claim proceeds as follows: (1) Each purchase constitutes a separate contract. *See* Mot. at 20. (2) Mutual assent is

11

United States District Court
For the Northern District of California

required for a valid contract. *See id.*; *Weddington Prods., Inc. v. Flick*, 60 Cal. App. 4th 793, 811 (1998). (3) Under California law, mutual assent is determined objectively, based on the reasonable meaning of the outward manifestations of the parties in the circumstances of the transaction. *See* Mot. at 20; *Weddington Prods.*, 60 Cal. App. 4th at 811. (4) In the context of an e-Store purchase, it is unreasonable to conclude that any customer assented to purchasing the same product a second time within fifteen minutes of the first purchase. *See* Mot. at 21. (5) As a result, there was no "purchase." *See id.* (6) Without a purchase, Apple was not entitled to charge Plaintiffs for the second download. Rather, by charging for the second download, Apple breached the Agreement, in particular the term stating that "Apple may charge your credit card or PayPal account for any products purchased." *Id.* at 12 & n.24.

Neither party contests that all class members' transactions were governed by the Agreement and California law. *Id.* at 15; Opp'n at 3. Similarly, the parties do not appear to contest that Apple would be in breach of the Agreement had Apple actually charged customers twice for a single "purchase" within the meaning of the Agreement. *Cf.* MTD Order at 12 n.4 ("During the hearing on Apple's Motion to Dismiss, Apple stated that it would not dispute that Herskowitz had sufficiently alleged a claim for breach of contract . . . if, indeed, Herskowitz's claim is that he downloaded one song once, for which he was charged twice."). If Apple did breach the Agreement, the appropriate remedy under California law would be damages in the amount double-billed. Cal. Civ. Code § 3300. Therefore, the primary (and likely only) contested issue is whether or not customers made a valid second "purchase" within the meaning of the Agreement. This depends entirely on whether the customer assented to the second purchase, and this is where Plaintiffs' effort to establish the predominance of common issues on their breach of contract claim founders.

The critical question of assent or non-assent turns on an individualized inquiry for each customer. First, the trier of fact will have to determine whether each customer intended to purchase the product a second time. This will likely vary from customer to customer, as some individuals may have intended to purchase two copies of the same item—as might be the case, for instance, if the customer had difficulty locating the first product purchased and simply lacked the time or the inclination to contact Apple for assistance. Second, even if the class member did *not* intend to

*United States District Court*
For the Northern District of California

United States District Court
For the Northern District of California

purchase the product a second time, the trier of fact will have to evaluate whether the class member's outward manifestations would nonetheless lead a reasonable person to believe that the customer assented to the second purchase. *See Weddington Prods.*, 60 Cal. App. 4th at 811 ("The existence of mutual consent is determined by objective rather than subjective criteria . . . ." (internal quotation marks omitted)). Such manifestations will vary from customer to customer. For example, the customer may have clicked buy only once. Or, the customer may have clicked buy a second time and the pop-up warning against duplicate purchases failed to appear. Or, the customer may have clicked buy a second time, the pop-up appeared, and the customer clicked buy again anyway. Determining the actions each customer took in the course of her transaction can only be established through individualized proof. Because Plaintiffs' breach of contract claim hinges on a question that can be resolved only on an individual basis, the Court finds that common questions do not predominate as to Plaintiffs' breach of contract claim for the Fifteen-Minute Class.

Plaintiffs propose to overcome the problem of individualized inquiries into each customer's assent to a second purchase through a presumption. *See* Mot. at 20. Specifically, Plaintiffs ask the Court to "presume[] as a matter of law" that a customer who downloaded two copies of the same product within fifteen minutes did not validly purchase the second product, because "it is unreasonable to conclude that class members gave their assent to purchase and pay for multiple copies of the same Product." *Id.* at 20-21. While a presumption of non-assent as to the entire Fifteen-Minute Class would appear, at least at first glance, to solve the predominance problem, this presumption is deeply flawed for a number of reasons.

First, the Court can find no authority to support Plaintiffs' proposed presumption. While Plaintiffs cite *Peterson v. H & R Block Tax Services Inc.*, 174 F.R.D. 78 (N.D. Ill. 1997), and *Negrete v. Allianz Life Insurance Co. of North America*, 238 F.R.D. 482 (C.D. Cal 2006), in support of a presumption of non-assent, *see* Mot. at 21-22, neither case is apposite. Both *Peterson* and *Negrete* are misrepresentation cases, in which the court presumed individual class members' reliance on the defendants' material misrepresentations. *Peterson*, 174 F.R.D. at 85; *Negrete*, 238

United States District Court
For the Northern District of California

1    F.R.D. at 491.[5] These cases reflect the well-established principle that in certain cases courts may

2    presume reliance on a defendant's uniform misrepresentations. *See* NEWBERG ON CLASS ACTIONS

3    §§ 4:58-60 (5th ed. 2013). *But see Mazza*, 666 F.3d at 595 (presumption of reliance not warranted

4    where defendant's alleged misrepresentations were not widely disseminated). Plaintiffs' breach of

5    contract claim, however, does not involve an alleged misrepresentation. Plaintiffs cite no authority

6    for the proposition that customers' subjective intent regarding assent to a contract, or lack thereof,

7    ought to be presumed, and the Court can find none.[6]

8          Even setting aside the lack of authority for Plaintiffs' proposed presumption, the Court

9    finds that the underlying premise of this presumption is flawed. Plaintiffs assert that no reasonable

10    customer would intentionally purchase the same product twice in a short amount of time. Plaintiffs

11    suggest that Apple may agree with them on this point, quoting a senior Apple executive as saying:

12    "Why would you click buy on something you already have[?]" Mot. at 1 (quoting Mot. Ex. 2, ECF

13    No. 106-2 at APL4053277). The Court observes, however, that there are several reasons why a

14    customer might want to make two purchases of the same product in a short span of time. For

15    example, the customer may have bought the product twice on separate devices, lacking the time,

16    ability, or desire to copy the first purchase from one device to the other. Alternatively, the customer

17    may have deleted or otherwise lost the first purchase after the file downloaded. Moreover, as

18    defined, the Fifteen-Minute Class does not exclude those who purchased a product twice through

19    two separate e-Store accounts (as might happen if the customer exceeded the device limit for one

20    account). Indeed, as defined, the Class does not even exclude those who purchased the song for

21    themselves, then purchased the song as a gift for someone else (such customers are "charged for a

22    second download"). In all these scenarios there is no question that the customer *wanted* the second

---

23    [5] *In re Apple, AT&T iPad Unlimited Data Plan Litigation*, No. 10-2553, 2012 WL 2428248 (N.D.

24    Cal. June 26, 2012), and *Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712 (9th Cir. 2012), which
Plaintiffs cite in their Motion, *see* Mot. at 22 & nn. 57, 59, are also misrepresentation cases, as are

25    *Werdebaugh v. Blue Diamond Growers*, No. 12-2724, 2014 WL 2191901 (N.D. Cal. May 23,
2014), and *Ries v. AriZona Beverages USA LLC*, 287 F.R.D. 523 (N.D. Cal. 2012), cited in

26    Plaintiffs' Reply, *see* Reply at 10 & nn. 26-27.
[6] Plaintiffs point to a number of other instances where courts use "presumptions." *See* Reply at 10

27    n.24. All these examples are similarly inapposite. Permissive presumptions of the kind cited by
Plaintiffs allow (but do not require) a trier of fact to make reasonable logical inferences based on a

28    set of proven facts. Here, by contrast, Plaintiffs are asking the Court to assume the truth of
Plaintiffs' factual allegations without evidentiary proof.

Case Nos.: 12-CV-02131-LHK; 12-CV-03124-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

purchase. While these scenarios may be uncommon, Plaintiffs provide no evidence that they are so rare as to make a blanket presumption of non-assent reasonable. Moreover, Plaintiffs do not propose any classwide method for distinguishing between the above scenarios and cases in which the customer did not intend to make a second purchase. For its part, the Court can think of no method for distinguishing among these various scenarios other than through individualized inquiries.

The problems with Plaintiffs' proposed presumption do not stop there. Assuming for the purpose of argument that no reasonable customer would intentionally purchase a product a second time, it does not follow that such customers could never outwardly manifest assent to a second purchase. The Fifteen-Minute Class includes customers who bought a product twice even though the warning pop-up appeared when the customer attempted to make the second purchase. (Plaintiffs do not allege that the pop-up never appeared. *Accord* Mot. at 5 ("Apple's [double-billing] prevention mechanisms do not *always* function properly." (emphasis added)).) The first line of the pop-up states, in bold type, "You have already purchased this item. Would you like to buy it again?" Decl. of Kishore Karkera ("Karkera Decl.") ECF No. 156-15 ¶ 7. Customers are given the option of clicking either "Buy" or "Cancel," and must click on one of the two options before continuing to use iTunes. *Id.* Ignoring for the time being whether Plaintiffs could ever prove non-assent as to customers who saw this pop-up and nevertheless chose to click buy a second time, the Court can say with confidence that the question of assent would be analyzed very differently for customers who saw this pop-up versus those who did not. However, Plaintiffs propose no classwide method of distinguishing between customers for whom the pop-up appeared and those for whom the pop-up did not appear, and the Court cannot think of any method to distinguish between these customers except through individualized inquiry.

In any event, even if the Court were to accept Plaintiffs' proposed presumption, individualized inquiries would still be required. As the proposed presumption of non-assent is rebuttable, Plaintiffs acknowledge that Apple could introduce evidence to rebut the presumption as to any specific class member. Mot. at 23. Plaintiffs assure the Court that "in no case will individual issues of customer intent predominate," *id.*, yet Plaintiffs provide no evidence or reasoning to

15

1   support this assertion. Rather, the exact opposite is likely to be true. If Apple is entitled to

2   challenge its liability as to every individual class member, then the parties and the Court will face

3   the same set of individualized issues as if the Plaintiffs' presumption of non-assent did not exist.

4   The fact that Plaintiffs' proposed presumption does not actually solve the predominance problem it

5   purports to address is yet another reason for rejecting this presumption.

6       For these reasons, the Court finds that Plaintiffs' proposed presumption of non-assent is

7   neither appropriate nor adequate to cure the predominance problem that arises as to the Fifteen-

8   Minute Class's breach of contract claim. Because common questions do not predominate for the

9   breach of contract claim, the Court concludes that this claim may not be certified under Rule

10  23(b)(3).

11              **ii.      Breach of the Implied Covenant of Good Faith and Fair**
                          **Dealing**

12      Under California law, "[e]very contract imposes on each party a duty of good faith and fair

13  dealing in each performance and its enforcement." *Carson v. Mercury Ins. Co.*, 210 Cal. App. 4th

14  409, 429 (2012) (internal quotation marks omitted). "The covenant 'is based on general contract

15  law and the long-standing rule that neither party will do anything which will injure the right of the

16  other to receive the benefits of the agreement.'" *Rosenfeld v. JP Morgan Chase Bank, N.A.*, 732 F.

17  Supp. 2d 952, 968 (N.D. Cal. 2010) (quoting *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 36

18  (1995)).

19      In order to establish a breach of the covenant of good faith and fair dealing, a plaintiff must

20  show: "(1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the

21  contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant

22  unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the

23  plaintiff was harmed by the defendant's conduct." *Id.* Plaintiffs claim that Apple breached the

24  implied covenant of good faith and fair dealing by "interfere[ing] with the rights of Plaintiff

25  Herskowitz to receive the benefits of the Agreement by double-billing him for ordering and

26  receiving a single download of a Product purchased under the Agreement." SAC ¶ 151. As this

27  quote from the SAC illustrates, the allegations that underlie Plaintiffs' breach of the implied

28

16

covenant of good faith and fair dealing claim are the same as those underlying Plaintiffs' breach of contract claim.

As with Plaintiffs' breach of contract claim, a necessary predicate to Plaintiffs' breach of the implied covenant of good faith and fair dealing claim is that there was no valid second purchase within the meaning of the Agreement. As a result, Plaintiffs' breach of the implied covenant claim presents the same issue of assent as Plaintiffs' breach of contract claim. For the reasons discussed above, the Court finds that individual questions are likely to predominate over common questions on the issue of whether customers assented to a second purchase. *See supra* Part III.A.2.a.i. Accordingly, the Court concludes that individual questions predominate over common questions regarding Plaintiffs' breach of the implied covenant of good faith and fair dealing claim for the Fifteen-Minute Class.

### iii.    CLRA

The CLRA prohibits "inserting an unconscionable provision in [a] contract" intended to result or which results in the sale or lease of goods or services to any consumers. Cal Civ. Code § 1770(a)(19). The Agreement provides that "all sales and rentals of products are final." Agreement at 1. Plaintiffs claim that Apple "refus[es] to refund Apple's customers who have been double-billed for ordering and receiving a single paid download of the same Product" pursuant to the "all sales . . . are final" provision of the Agreement. SAC ¶ 174. Plaintiffs contend that this practice makes the "all sales . . . are final" provision unconscionable and in violation of the CLRA. *Id*. Under California law, a contract term is unconscionable if it is both procedurally and substantively unconscionable. *See A&M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 485 (1982). Procedural unconscionability "takes into consideration the parties' relative bargaining strength and the extent to which a provision is 'hidden' or unexpected, while [substantive unconscionability] requires terms that 'shock the conscience' or at the least may be described as 'harsh or oppressive.'" *Woodside Homes of Cal., Inc. v. Superior Court*, 107 Cal. App. 4th 723, 727 (2003) (quoting *24 Hour Fitness, Inc. v. Superior Court*, 66 Cal. App. 4th 1199, 1212-13 (1998)).

Case Nos.: 12-CV-02131-LHK; 12-CV-03124-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    Plaintiffs contend that the common questions regarding Plaintiffs' CLRA claim

2 predominate over individual ones. Plaintiffs contend that these common questions include: (1)

3 whether iTunes songs are "goods" or "services" for the purposes of the CLRA; (2) whether the "all

4 sales . . . are final" provision of the Agreement is procedurally and substantively unconscionable;

5 and (3) what the appropriate remedy is if the "all sales . . . are final" provision is found to be

6 unconscionable. *See* Mot. at 23-24. The Court agrees that the question of whether an iTunes song is

7 a "good" or "service" for CLRA purposes is a common question. The Court similarly agrees that

8 unconscionability of a contract term, as well as the appropriate remedy for an unconscionable

9 contract term, may in some circumstances be common questions capable of resolution on a

10 classwide basis. *See, e.g., O'Donovan v. CashCall, Inc.*, 278 F.R.D. 479, 499-502 (N.D. Cal. 2011)

11 (certifying a Rule 23(b)(3) class as to claims that defendant's loan rates of 90% or higher were

12 unconscionable under California law).

13    Nevertheless, the Court finds that the resolution of the CLRA claims in *this* case will likely

14 involve numerous individual questions that will overwhelm the common issues. This is because

15 there is no evidence that Apple has a common, let alone uniform or "blanket," practice of denying

16 refunds to customers who are charged twice for a single product. To the contrary, substantial

17 evidence in the record indicates that Apple frequently declined to enforce the "all sales . . . are

18 final" provision of the Agreement and instead granted refunds or regrants to customers. Apple

19 presented evidence that, in practice, it issues refunds, credits, or regrants in cases in which

20 "customers report an accidental or duplicate purchase, song quality issues, lost songs, or other

21 issues." Decl. of Larry Phillips ("Phillips Decl.") ECF No. 156-19 ¶ 5. Apple further provided a

22 sample of customer support requests that purport to show that Apple denied refund requests in

23 fewer than ▮ of cases.[7] Opp'n at 5; Phillips Decl. Ex. 7. This evidence provides no indication of

24 any pattern or policy common to the cases where Apple denied refund requests, and Plaintiffs offer

25 no evidence in support of their contention that Apple was, in fact, implementing a "blanket 'no-

26

27 ──────────────────────

[7] The Court does not assess the accuracy of Apple's claim, or determine that such a sample is

28 representative of all refund requests. The Court only notes this as evidence that whatever Apple's
refund policy was, it was not a "*blanket* 'no-refund' policy."

18

1  refund'" policy.[8] However, in the absence of a consistent or uniform practice of refusing to grant

2  refunds in cases of double-billing, the Court will have to consider whether Apple's conduct was

3  unconscionable on a transaction-by-transaction basis. Such an individualized inquiry would

4  overwhelm any remaining common issues that make up Plaintiffs' CLRA claim.[9]

5         Further complicating the unconscionability analysis is the fact that the circumstances under

6  which customers did not receive refunds and regrants may have varied considerably. Whereas

7  some customers may have been denied refunds under the "all sales . . . are final" provision even

8  though Apple was responsible for double-charging the customer for a single purchase (as

9  Herskowitz alleges occurred in his case), other customers may not have received refunds because

10 they did not request them, or because they waited unduly long to request them, or because Apple

11 concluded that the customer intentionally purchased the same product twice. As defined, the

12 Fifteen-Minute Class lumps all such customers together, and yet the unconscionability analysis,

13 and particularly the substantive unconscionability analysis, would differ considerably across these

14 various scenarios.[10] In light of the fact that determining whether Apple's decision to deny a refund

15 was unconscionable on any given occasion is likely to require an individualized inquiry into the

16 circumstances of the specific transaction, the Court cannot say that common questions will

17 predominate over individual ones with respect to Plaintiffs' CLRA claim. Accordingly, the Court

18

19 [8] Indeed, Plaintiffs themselves appear to acknowledge that Apple's purportedly "blanket" policy
   was, in reality, far from uniform. *See* Mot. at 2 ("Apple voluntarily refunded [double-billed
20 purchases] in some situations."); *see also id.* at 9, 16 n.37 (acknowledging existence of Apple
   policies allowing for refunds and regrants in the case of accidental and duplicate purchases).
21 Though Plaintiffs additionally claim that "the refunds were gratuitous on Apple's part" and "Apple
   decided in its sole discretion whether and when to refund," *id.* at 2, the fact that Apple gave refunds
22 at all means, by definition, that Apple did not have a uniform policy of denying refunds.
   [9] Although Plaintiffs' proffered definition of the Fifteen-Minute Class does not technically exclude
23 customers that previously received refunds for duplicate product purchases, *see supra* Part I.B.2.a.,
   Plaintiffs state in their Reply that such individuals would not be members of the class. *See* Reply at
24 9 ("[W]here a customer has received a refund for being double-billed, she is not seeking to recover
   another refund."). However, simply excluding individuals who already received refunds from the
25 Fifteen-Minute Class definition does not solve Plaintiffs' predominance problem with respect to
   their CLRA claim, as *identifying* these excluded individuals will still require fact-intensive,
26 individualized inquiry.
   [10] For instance, while denying a customer a refund in a circumstance in which Apple itself was
27 responsible for the overcharge might well be deemed "harsh or oppressive" and thus substantively
   unconscionable, the Court is skeptical of a claim of substantive unconscionability in a case in
28 which a customer was denied a refund when the customer intentionally clicked buy twice even
   after having received the pop-up warning against duplicate purchases. *See supra* Part III.A.2.a.i.

19

Case Nos.: 12-CV-02131-LHK; 12-CV-03124-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    concludes that Plaintiffs have failed to satisfy the predominance requirement as to the CLRA claim

2    for the Fifteen-Minute Class.[11]

3                                    **iv.    UCL**

4           The UCL creates a cause of action for business practices that are: (1) unlawful, (2) unfair,

5    or (3) fraudulent. Cal. Bus. & Prof. Code §§ 17200. The UCL's coverage is "sweeping" and its

6    standard for wrongful business conduct is "intentionally broad." *In re First Alliance Mortg. Co.*,

7    471 F.3d 977, 995 (9th Cir. 2006). Each prong of the UCL provides a separate and distinct theory

8    of liability. *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007). Plaintiffs

9    assert claims under both the "unlawful" and "unfair" prongs. SAC ¶ 162.

10                                   **a)    Unlawful**

11          The "unlawful" prong of the UCL prohibits "anything that can properly be called a business

12   practice and that at the same time is forbidden by law." *Cel-Tech Commcn's, Inc. v. L.A. Cellular*

13   *Tel. Co.*, 20 Cal. 4th 163, 180 (1990) (internal quotation marks omitted). By proscribing "any

14   unlawful" business practice, the UCL permits injured consumers to "borrow" violations of other

15   laws and treat them as unlawful competition that is independently actionable. *Id.* Plaintiffs allege

16   that Apple's "policy and/or practice under the Agreement of refusing to award refunds to

17   customers who have been double-billed" is unlawful under the UCL because the policy is

18   unconscionable and constitutes breaches of contract and the implied covenant of good faith and fair

19   dealing. SAC ¶ 168.

20          The Court has already determined that individual questions are likely to predominate over

21   common questions regarding Plaintiffs' unconscionability claims for the Fifteen-Minute Class. *See*

22   *supra* Part III.A.2.a.iii. Similarly, the Court has already determined that individual questions will

23   predominate regarding Plaintiffs' breach of contract and breach of the implied covenant of good

24   faith and fair dealing claims for the Fifteen-Minute Class. *See supra* Part III.A.2.a.i; Part

25   III.A.2.a.ii. Consequently, the Court concludes that individual questions are also likely to

26   ――――――――――――――――――

27   [11] Plaintiffs suggest in the alternative that the relevant "uniform" policy for the CLRA claim is
     Apple's stated internal policy of denying refund requests made more than thirty days after the date
     of the download. Reply at 3. Plaintiffs provide no evidence, however, that Apple applied such a
28   policy to every member of the Fifteen-Minute Class, or even to a sizeable proportion of the Class.

20

1   predominate regarding Plaintiffs' claim under the "unlawful" prong of the UCL for the Fifteen-

2   Minute Class.

3                           **b)      Unfair**

4           The "unfair" prong of the UCL creates a cause of action for a business practice that is

5   unfair even if not proscribed by some other law. *Korea Supply Co. v. Lockheed Martin Corp.*, 29

6   Cal. 4th 1134, 1143 (2003). "The UCL does not define the term 'unfair' . . . [and] the proper

7   definition of 'unfair' conduct against consumers 'is currently in flux' among California courts."

8   *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (citing *Lozano*, 504 F.3d at

9   735). Nevertheless, there are at least two possible tests: (1) the "tethering test," which requires

10  "that the public policy which is a predicate to a consumer unfair competition action under the

11  'unfair' prong of the UCL must be tethered to specific constitutional, statutory, or regulatory

12  provisions," *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010); *Bardin*

13  *v. Daimlerchrysler Corp.*, 136 Cal. App. 4th 1255, 1260-61 (2006); and (2) the "balancing test,"

14  which examines whether the challenged business practice is "immoral, unethical, oppressive,

15  unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of

16  the defendant's conduct against the gravity of the harm to the alleged victim," *Drum*, 182 Cal. App.

17  4th at 257 (citing *Bardin*, 136 Cal. App. 4th at 1260).[12] The focus of the UCL is on the defendant's

18  conduct and not the plaintiff's damages. *See, e.g.*, *In re Tobacco II Cases*, 46 Cal. 4th 298, 312

19  (2009). Plaintiffs allege that Apple's practices of "double-bill[ing] customers . . . for ordering and

20  receiving a single paid download of the same Product" and refusing "to refund overcharges" is

21  unfair because it is "immoral, unethical, oppressive, unscrupulous or substantially injurious to

22  consumers." SAC ¶¶ 164-166.

23

24

_____

25  [12] *Cf. Williamson v. Reinalt-Thomas Corp.*, No. 11-3548, 2012 WL 1438812, at *11 (N.D. Cal.
    Apr. 25, 2012) (recognizing that the "balancing test" is sometimes construed as two separate tests,

26  as some California appellate courts have applied the balancing test as requiring only that a court
    "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim,"

27  *see S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886 (1999), whereas
    other appellate state courts have applied a slightly different test which mandates that plaintiffs

28  show that a practice is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to
    consumers," *see Bardin*, 136 Cal. App. 4th at 1260).

21

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1       The Court has already determined that individual questions are likely to predominate over

2   common questions regarding Plaintiffs' statutory claims of unconscionability under the CLRA. *See*

3   *supra* Part III.A.2.a.iii. The Court therefore concludes that under the "tethering test," individual

4   questions are likely to predominate over common questions regarding Plaintiffs' unfair UCL claim

5   for the Fifteen-Minute Class. Accordingly, the Court turns to Plaintiffs' unfair UCL claim under

6   the "balancing test." In order to prevail under the balancing test, Plaintiffs must demonstrate that

7   (1) Apple's business practice was "immoral, unethical, oppressive, unscrupulous or substantially

8   injurious to consumers," and (2) that the harm resulting from such practice (3) outweighed the

9   utility of the practice. *See Drum*, 182 Cal. App. 4th at 257.

10      As to the first element, Apple's challenged business practice, the Court notes that Plaintiffs'

11  claim hinges on the existence of a uniform business practice or series of practices amenable to

12  some degree of precise definition. Without a uniform practice, determining whether or not Apple's

13  conduct was "immoral, unethical, oppressive, unscrupulous or substantially injurious" will devolve

14  into an individualized inquiry into Apple's behavior in the course of specific transactions. As

15  discussed above, however, *see supra* Part III.A.2.a.iii, Plaintiffs have failed to provide any

16  evidence to support the existence of a uniform business practice or series of practices respecting

17  refunds in cases of double-billing.

18      The second element, resulting harm, is similarly unlikely to be susceptible to common

19  resolution. A class member who clicked buy once and received one download, but was charged

20  twice, applied for a refund, and was denied a refund, likely suffered a different harm than a class

21  member who clicked buy twice, saw the warning pop-up, confirmed the second purchase, received

22  two downloads, and did not apply for a refund. While it may be possible to determine harm

23  uniformly for each of these (and other) possible scenarios, determining which scenario applies to

24  any given class member will require individualized inquiries.

25      As to the third element, weighing utility, the utility of Apple's business practice, uniform or

26  not, will again likely require individualized inquiries. Plaintiffs do not propose any method of

27  determining utility classwide, and the Court observes that the utility of not providing a refund to a

28  customer who never requested a refund is likely different from the utility of denying a refund to a

22

United States District Court
For the Northern District of California

customer who requested a refund within minutes of the second charge, and different again from the utility of denying a refund to a customer who requested a refund a year after the second charge. Thus, determining utility will likely require individualized determinations tailored to the particular circumstances of each class member's transaction. Weighing that utility against the harm suffered by the class members will similarly require individualized inquiries.

The Court finds that under the balancing test, Plaintiffs' unfair UCL claim for the Fifteen-Minute Class will raise a multiplicity of individual questions. The few common questions that may arise will not obviate the need for individualized inquiries. Accordingly, the Court concludes that individual questions predominate over common questions regarding Plaintiffs' unfair UCL claims under either the tethering test or the balancing test for the Fifteen-Minute Class.

* * *

For the foregoing reasons, the Court finds that individual questions predominate over common questions regarding all of Plaintiffs' claims for the Fifteen-Minute Class. The Court therefore DENIES Plaintiffs' Motion for Class Certification of the Fifteen-Minute Class under Rule 23(b)(3).

### b.     Class B: Unusable Product Class

For the Unusable Product Class, Plaintiffs allege claims of breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud. Mot. at 25, 26. The Court will assess the predominance of common or individual questions for each claim in turn.

### i.     Breach of Contract

Plaintiffs allege two breach of contract claims for the Unusable Product Class. The first claim is that Apple did not provide refunds for unusable products as required by the Agreement. SAC ¶¶ 134-135. As noted above, the Agreement provides that "[i]f technical problems prevent or unreasonably delay delivery of your product, your sole and exclusive remedy is a either a replacement or refund of the price paid, as determined by Apple." Agreement at 2. Plaintiffs claim that Apple charged class members for a product that Apple did not deliver to the class members in a usable form during the purchasing session, and then breached the Agreement by failing to refund

23

1    that charge and instead charging class members a second time to receive a usable product. SAC

2    ¶¶ 134-135.

3           Plaintiffs' second claim is that Apple violated the Agreement by failing to provide Plaintiffs

4    usable products in the first place. SAC ¶ 137. California contract law incorporates the Uniform

5    Commercial Code ("UCC"), *see* Cal. Com. Code, which Plaintiffs contend requires that "delivery

6    of goods must be conforming to the reasonable commercial or consumer expectations of the

7    buyer," SAC ¶ 136. Plaintiffs claim that providing products that class members were "unable to

8    find, access and/or use in a timely fashion" was not a "conforming" delivery. *Id.* ¶ 137.

9           Both of Plaintiffs' breach of contract claims for the Unusable Product Class require

10   showing that class members did not receive a product in a "usable" form. Plaintiffs define a

11   "usable" product as a "Product that can be played, viewed, or utilized *in the manner expected by a*

12   *reasonable buyer* of the Product." *Id.* ¶ 30 (emphasis added). Plaintiffs further clarify that the

13   "manner expected by a reasonable buyer" is that "customers will automatically receive products

14   from Apple . . . in their iTunes library," such that "[t]he user should only need to click the button,

15   and at that point the rest of the system is automatic." Reply at 6 (quoting Dep. of Colin Meldrum

16   ("Meldrum Dep.") ECF No. 170-3 at 46:22-47:1)).

17          As Plaintiffs' own definition makes clear, however, determining whether any given

18   customer received a "usable" product will require an individualized inquiry into the factual

19   circumstances of each customer's transaction. Whether a purchased product did or did not appear

20   in a given customer's iTunes library is an individual question that will require transaction- and

21   customer-specific proof. Furthermore, Plaintiffs' definition of "usable" appears to require that a

22   product appear in a customer's iTunes library within a "reasonable" time following the purchase.

23   Juel herself, for instance, claims that she did not receive a "usable" product because she was unable

24   to find the first download of "Auld Lang Syne" in her iTunes library within three minutes of

25   clicking "buy" to purchase the song. SAC ¶¶ 49-53. Juel is thus essentially claiming that a product

26   that took longer than three minutes to appear in her iTunes library was not delivered within a

27   reasonable period of time and was unusable as a result. Whether or not any given time lag between

28   a purchase and the appearance of the purchased product in a customer's iTunes library is

United States District Court

For the Northern District of California

24

1    reasonable, however, may depend on a host of individualized factors, such as the quality of the

2    customer's internet connection, the age and capacity of the downloading device, and the other

3    activities in which the downloading device may be engaged at the time of the download. The need

4    to examine the circumstances of any given transaction to determine whether the time it took a

5    product to appear in the customer's library—or, alternatively, the amount of time the customer

6    waited before downloading the product a second time—was reasonable or unreasonable introduces

7    numerous individual questions into the breach of contract analysis.

8         Plaintiffs appear to suggest two potential work-arounds in an effort to convince the Court

9    that common questions predominate with respect to their breach of contract claims. The first is a

10   presumption similar to the one proposed for the Fifteen-Minute Class, whereby the Court would

11   presume that a second purchase "of the *same* item, on the *same* device, during the *same* purchasing

12   session" is necessarily "an error." Reply at 6. As with their proposed presumption of non-assent for

13   the Fifteen-Minute Class, Plaintiffs justify this presumption on the ground that there is no possible

14   reason for a second purchase in such circumstances. *See id.* ("Why would you click buy on

15   something you already have?"). However, even if the Court were to accept the presumption that

16   these second purchases were made in "error" in the sense that the customer only purchased the

17   product a second time because she believed that the first purchase had been unsuccessful, this

18   presumption does not resolve the question of whether or not the customer, in fact, received a

19   "usable" product following the first purchase. To take Juel's own case as an example: assuming

20   that Juel believed that the first download was not successful because "Auld Lang Syne" did not

21   appear in her iTunes library within three minutes of clicking buy does not resolve the question of

22   whether it was reasonable for Juel to have had that belief. Determining whether or not class

23   members received "usable" products according to Plaintiffs' own definition of the term would

24   therefore still require individualized inquiries. *Accord* SAC ¶ 30 (defining "usable" as "a Product

25   that can be played, viewed, or utilized in the manner *expected by a reasonable buyer of the*

26   *Product*" (emphasis added)).

27        Plaintiffs' second potential work-around relies on two databases Apple allegedly maintains

28   to log and track errors experienced by customers. Plaintiffs allege that the first database,

25

United States District Court
For the Northern District of California

"MZ_client_error," tracks whether or not a customer has "received a purchased Product in usable form." Mot. at 11 ("[T]he iTunes application sends a notification to Apple when the customer has not received a purchased Product in a usable form, for such reasons as a 'bad download,' a 'bad [MD]5,' and/or an 'incomplete download.'" (citing Mot. Ex. 53, ECF No. 111-3, at APL0572995)). Plaintiffs allege that the second database, "MZ_download," tracks whether or not a purchase downloaded completely to a customer's computer. *Id.* As the Court understands it, Plaintiffs argue that it will be possible to identify whether or not a customer received a "usable" product based on the records contained in these two databases. *See id.* ("Apple holds all the keys needed to determine whether a customer received a Product in a usable format."). However, the Court notes two problems with relying on these databases. First, Plaintiffs do not allege that Juel's first, and allegedly unusable, purchase of "Auld Lang Syne" is recorded in the MZ_client_error database. Indeed, no record corresponding to Juel's computer or time of download appears in the sample of fifteen records from the MZ_client_error database for downloads of "Auld Lang Syne" on December 31, 2010.[13] *See* Reply Ex. R, ECF No. 170-18.

Second, plaintiffs do not allege that what is recorded in either the MZ_client_error or MZ_download databases reflects Plaintiffs' own definition of a "usable" product. Plaintiffs allege that the MZ_client_error database creates a record when the customer's iTunes software reports certain errors in the course of a download. *See* Reply at 6-7 (citing Meldrum Dep. at 140:23-141:5 ("My understanding is that [MZ_client_error] was introduced for diagnostic purposes specific to identifying where a particular resource was problematic or to identify problems with customers' Internet connections which may cause them problems.")). Plaintiffs do not claim, and the evidence does not show, that the MZ_client_error database records *every* error that might occur in the course of a download, including errors where the download does not occur at all, where a download completes successfully but fails to appear in the customer's iTunes library, or where a download is

---

[13] Even following the hearing, it remains unclear whether this sample is the complete listing of records in MZ_client_error for downloads of "Auld Lang Syne" on December 31, 2010. Apple contends, however, that neither Juel nor Herskowitz appear in MZ_client_error for any transaction. *See* Apple's Reply in Support of Mot. for Summ. Judgment, ECF No. 179-4 at 10. If that is the case, then even Plaintiffs must concede that the MZ_client_error database is inadequate to identify customers who did not receive usable products, since Juel's own allegedly unusable download does not appear in the database.

Case Nos.: 12-CV-02131-LHK; 12-CV-03124-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

United States District Court
For the Northern District of California

1    successful but takes an "unreasonably" long time to complete. These three scenarios would all be

2    instances in which the customer did not receive a "usable" product within Plaintiffs' definition of

3    the term, but these instances would not appear in the MZ_client_error database. Plaintiffs similarly

4    do not allege that the MZ_download database records all instances in which a customer does not

5    receive a "usable" product. *See* Meldrum Dep. at 91:7-18 ("If an MZ Download record has the

6    status marked as fulfilled, that indicates to the server that we received a message from the iTunes

7    [software] indicating that the download had completed. . . . Whether the actual asset was playable

8    or not, in normal circumstance[s] that would be playable. In exceptional circumstances there may

9    be an audio dropout or something in the middle of the asset."). Indeed, Plaintiffs could not

10   consistently allege that the MZ_download database records every instance in which a customer

11   does not receive a usable product, as the database apparently reports that Juel received two

12   complete downloads of "Auld Lang Syne" on December 31, 2010. *See* Ghaffari Decl. ¶¶ 3, 7;

13   Ghaffari Decl. Ex. 1, ECF No. 152-14. As neither the MZ_client_error database nor the

14   MZ_download database provides a means for identifying customers who did not receive "usable"

15   products on a classwide basis,[14] the Court finds that the existence of these databases will not

16   eliminate the need for individualized inquiries into whether customers received products in a

17   "usable" form.[15]

18           Against the fact-intensive individual question of whether a customer received a product in a

19   "usable" form, the Court identifies two common questions. The first is whether customers are

20   required to contact Apple for a refund or replacement when a product is not delivered due to

21   technical problems or is unreasonably delayed, or if Apple is in breach of the Agreement by not

22

23   [14] Plaintiffs additionally reference a third database, "MZ_download_error," that purportedly
     documents errors that occur during the download process. *See* Reply at 7. As with MZ_client_error
24   and MZ_download, there is no evidence that this database records all errors that might occur that
     would lead to a product being "unusable" under Plaintiffs' definition of that term.
25   [15] Apple has filed a Motion for Leave to File a Surreply Declaration in Opposition to Plaintiffs'
     Motion for Class Certification in which Apple seeks to introduce additional evidence that the
26   MZ_client_error and MZ_download databases are not adequate to identify customers that received
     (or did not receive) products in a "usable" form. *See* ECF No. 181. Plaintiffs oppose the motion.
27   *See* ECF No. 185. The Court need not resolve this dispute for purposes of the Class Certification
     Motion because the problems the Court identifies with the MZ_client_error and MZ_download
28   databases are supported by evidence other than Apple's proffered surreply declaration.
     Accordingly, the Court DENIES Apple's Motion for Leave to File a Surreply Declaration as moot.

Case Nos.: 12-CV-02131-LHK; 12-CV-03124-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

proactively providing refunds or replacements. *See, e.g.*, SAC ¶ 51 ("Apple breached its Agreement with Ms. Juel by charging her for a download at 7:06 p.m., which was not delivered to her, *when its Agreement with Ms. Juel provides that it is obligated to refund the purchase price in such instances.*" (emphasis added)). The second common question is whether the UCC's provisions on "conforming deliveries" apply to purchases from the iTunes Store. The Court notes, however, that both these common questions are likely to lead to more individualized inquiries.[16] Because resolution of Plaintiffs' breach of contract claims will require numerous individualized inquiries, the Court concludes that individual questions predominate over common questions regarding Plaintiffs' breach of contract claims for the Unusable Product Class.[17]

### ii.  Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiffs allege that Apple breached the implied covenant of good faith and fair dealing by "failing to deliver a usable Product, but then double charging to receive it in usable form." Mot. at 26. As with Plaintiffs' breach of contract claims, to prevail on this claim Plaintiffs will need to demonstrate that every class member did not receive a "usable" product. This can only be resolved with individualized inquiries. *See supra* Part III.A.2.b.i. The Court therefore concludes that individual questions predominate over common questions regarding Plaintiffs' breach of the implied covenant of good faith and fair dealing claim for the Unusable Product Class.

### iii.  Fraud

The essence of Plaintiffs' fraud claim is that Apple represented to the Unusable Product Class that customers would be "entitled to 'either replacement or refund of the purchase price paid'

---

[16] If customers need to contact Apple in order to receive refunds, individualized inquiries would be required to determine if any given refund denial was unreasonable or otherwise in breach of the Agreement. If customers do not need to contact Apple, individualized inquiries would be required to determine which customers should have received a refund or replacement because Apple had actual or constructive notice that the customer did not receive a "usable" product. If the UCC's provisions on "non-conforming deliveries" do apply to e-Store purchases, then whether any given purchase was not reasonably "conforming" will require individualized inquiries that may not be identical to the inquiry into whether the product was "usable."

[17] The Court notes that the individual inquiry required to resolve whether or not a class member's product was "usable" also goes to the ascertainability of the Unusable Product Class, in that Plaintiffs have not proposed an "administratively feasible" means of determining who is a class member. *See, e.g.*, *Sethavanish v. ZonePerfect Nutrition Co.*, No. 12-2907, 2014 WL 580696, at *4 (N.D. Cal. Feb. 13, 2014).

Case Nos.: 12-CV-02131-LHK; 12-CV-03124-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

United States District Court
For the Northern District of California

1   for a Product, should 'technical problems prevent or unreasonably delay delivery,'" when, in

2   reality, Apple "commonly charged a user a second time after the user purchased a Product but did

3   not receive that Product in a usable form." Mot. at 27 (quoting Agreement). As with Plaintiffs'

4   breach of contract and breach of the implied covenant of good faith and fair dealing claims,

5   adjudicating this claim will require a determination of whether individual customers received

6   "usable" products. As discussed at length above, *see supra* Part III.A.2.b.i, Plaintiffs have not

7   proposed any viable classwide means of determining whether customers received "usable"

8   products, and as such, this question can only be resolved through individualized inquiries. Though

9   the Court acknowledges that Plaintiffs' fraud claim presents several common questions—such as

10  whether the Agreement's representation that Apple would provide refunds or regrants in cases in

11  which "technical problems prevent or unreasonably delay delivery" of a product was false, and if

12  so, whether Apple was aware that this representation was false—the Court finds that these common

13  questions do not predominate over the critical and fact-intensive question of whether any

14  individual class member received an "unusable" product and was therefore entitled to a refund.

15  Accordingly, the Court concludes that Plaintiffs' fraud claim for the Unusable Product Class fails

16  to satisfy Rule 23(b)(3)'s predominance requirement.

17                                              * * *

18        For the foregoing reasons, the Court finds that individual questions predominate over

19  common questions regarding all of Plaintiffs' claims for the Unusable Product Class. The Court

20  therefore DENIES Plaintiffs' Motion for Class Certification of the Unusable Product Class under

21  Rule 23(b)(3).

22        **B.      Rule 23(b)(2) Requirements**

23        The Court now turns to Plaintiffs' Motion for Class Certification of the Active e-Stores

24  Account Class under Rule 23(b)(2).

25               **1.      Legal Standard**

26        To certify a class under Rule 23(b)(2), the Court must find that "the party opposing the

27  class has acted or refused to act on grounds that apply generally to the class, so that final injunctive

28  relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R.

Case Nos.: 12-CV-02131-LHK; 12-CV-03124-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

United States District Court
For the Northern District of California

1   Civ. P. 23(b)(2). Ordinarily, it follows that there is no need "to undertake a case-specific inquiry

2   into whether class issues must predominate or whether class action is the superior method of

3   adjudicating the dispute" under the other subsections of Rule 23(b). *Dukes*, 131 S. Ct. at 2558.

4   Rather, "[p]redominance and superiority are self-evident." *Id*. Only a showing of cohesiveness of

5   class claims is required. *See, e.g.*, *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 635 (W.D.

6   Wash. 2011). "The key to [a Rule 23(b)(2)] class is . . . the notion that the conduct is such that it

7   can be enjoined or declared unlawful only as to all of the class members or as to none of them."

8   *Dukes*, 131 S. Ct. at 2557 (internal quotation marks omitted). To certify a class under Rule

9   23(b)(2), it is generally sufficient "that class members complain of a pattern or practice that is

10  generally applicable to the class as a whole." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th. Cir

11  2009). However, Rule 23(b)(2) does not authorize class certification "when each individual class

12  member would be entitled to a *different* injunction or declaratory judgment against the defendant."

13  *Dukes*, 131 S. Ct. at 2557. Moreover, "class certification under Rule 23(b)(2) is appropriate only

14  where the primary relief sought is declaratory or injunctive." *Ellis v. Costco Wholesale Corp.*, 657

15  F.3d 970, 986 (9th Cir. 2011) (quoting *Zinser*, 253 F.3d at 1195). As a result, Rule 23(b)(2)

16  certification is available for monetary relief, if at all, only when such relief is incidental to the

17  injunctive or declaratory relief sought. *Dukes*, 131 S. Ct. at 2557.

18                    **2.      Application**

19          Plaintiffs seek an injunction "enjoining Apple's unlawful blanket enforcement of its 'no

20  refund' 'all sales are final' policy." Mot. at 17. Plaintiffs contend that an injunction is warranted to

21  protect all Apple's customers from this "unfair and unlawful" policy. *Id.* at 18.

22          As discussed above, Plaintiffs' characterization of Apple's refund policy as a "blanket no-

23  refund policy" is inconsistent with Plaintiffs' own factual allegations and the evidence in the

24  record. *See supra* Part III.A.2.a.iii. There is simply no support for Plaintiffs' assertion that Apple

25  had a "uniform policy respecting refunds," Reply at 14, either in general, or in cases in which a

26  customer was charged twice after clicking buy only once or in which a customer was charged twice

27  to receive a single "usable" product. Accordingly, the Court finds that Plaintiffs are not challenging

28  a "pattern or practice that is generally applicable to the class as a whole." *Rodriguez*, 591 F.3d at

1125. Rather, Plaintiffs are challenging Apple's variable conduct in the course of diverse, individualized transactions. To the extent any customer would be entitled to an injunction against Apple based on Apple's conduct as to the individual customer, the nature of that injunction would differ depending on the specific facts giving rise to the individual customer's claim. *See Dukes*, 131 S. Ct. at 2557 ("[Rule 23(b)(2)] does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant."). As Plaintiffs cannot identify a generally applicable practice that they seek to enjoin, the Court concludes that Plaintiffs have not met their burden to show that the proposed Active e-Stores Account Class is amenable to certification under Rule 23(b)(2).

The Active e-Stores Account Class is not certifiable under Rule 23(b)(2) for the additional reason that Plaintiffs' claim for injunctive relief is, in essence, a claim for monetary damages rather than for "final injunctive relief." Fed. R. Civ. P. 23(b)(2). Plaintiffs assert that certification under Ruler 23(b)(2) is appropriate as an injunction "will afford class members meaningful relief separate and apart from any damages awarded under Rule 23(b)(3)." Reply at 11. Plaintiffs clarify, however, that this "separate" relief would be that class members could "make refund requests to Apple." *Id.* Thus, what Plaintiffs are truly seeking is a judicial declaration that could be individually enforced against Apple to obtain refunds in cases in which class members could demonstrate that they were wrongfully double-charged. This is inappropriate for two reasons.

First, Plaintiffs' proposed injunction is practically indistinguishable from an order that Apple pay Plaintiffs money. This runs afoul of the general equitable principle that "that a plaintiff cannot transform a claim for damages into an equitable action by asking for an injunction that orders the payment of money." *Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 531 (D.C. Cir. 2006) (internal quotation marks omitted); *see also Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) ("Almost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty." (alteration in original) (internal quotation marks omitted)). Second, given that Plaintiffs seek an injunction solely to enable

31

individual class members to seek refunds from Apple, Plaintiffs are not seeking "final" injunctive relief, as required by Rule 23(b)(2), but instead are merely attempting to lay a foundation for individual damages requests. *See, e.g.*, *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 (7th Cir. 2011) ("An injunction is not a final remedy if it would merely lay an evidentiary foundation for subsequent determinations of liability."). Given that Plaintiffs have failed to show that Apple "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," Fed. R. Civ. P. 23(b)(2), the Court DENIES Plaintiffs' Motion for Class Certification of the Active e-Stores Account Class under Rule 23(b)(2).

## IV.   CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's Motion for Class Certification in its entirety.

**IT IS SO ORDERED.**


Dated: August 7, 2014

LUCY H. KOH
United States District Judge

Case Nos.: 12-CV-02131-LHK; 12-CV-03124-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION